No. 16-3561

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OHIO DEMOCRATIC PARTY; | : | On Appeal from the |
| DEMOCRATIC PARTY OF CUYAHOGA | : | United States District Court |
| COUNTY; MONTGOMERY COUNTY | : | for the Southern District of Ohio |
| DEMOCRATIC PARTY; JORDAN ISERN; | : | Eastern Division |
| CAROL BIEHLE; BRUCE BUTCHER, | : | |
| Plaintiffs-Appellees, | : | District Court Case No. |
| | : | 2:15-cv-1802 |
| v. | : | |
| | : | |
| JON HUSTED, IN HIS OFFICIAL | : | |
| CAPACITY AS SECRETARY OF STATE | : | |
| OF THE STATE OF OHIO; MIKE | : | |
| DEWINE, IN HIS OFFICIAL CAPACITY | : | |
| AS ATTORNEY GENERAL OF THE | : | |
| STATE OF OHIO, | : | |
| Defendants-Appellants. | : | |

---

## BRIEF OF APPELLANTS OHIO SECRETARY OF STATE JON HUSTED AND OHIO ATTORNEY GENERAL MIKE DEWINE

---

MICHAEL DEWINE
Ohio Attorney General
ERIC E. MURPHY* (0083284)
State Solicitor
 *Counsel of Record
MICHAEL J. HENDERSHOT (0081842)
Chief Deputy Solicitor
STEPHEN P. CARNEY (0063460)
Deputy Solicitor
STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980; 614-466-5087 fax
eric.murphy@ohioattorneygeneral.gov

Counsel for Appellants Ohio Secretary of
State Jon Husted and Ohio Attorney
General Michael DeWine

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS........................................................................i

TABLE OF AUTHORITIES ............................................................iv

STATEMENT REGARDING ORAL ARGUMENT ........................... xiii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES..........................................................1

INTRODUCTION ..............................................................................1

STATEMENT OF THE CASE.............................................................5

    A.    Throughout This Nation's History, States Have Permitted Most Voters To Vote Only On Election Day ................................................5

    B.    Ohio Has Used No-Excuse Absentee Voting Since 2006....................7

    C.    Ohio's Voting Regime Contains Expansive Options...........................11

    D.    The District Court Enjoined The Early-Voting Law ..........................12

SUMMARY OF ARGUMENT ..........................................................14

STANDARD OF REVIEW ...............................................................17

ARGUMENT ...................................................................................17

I.    THE FOURTEENTH AMENDMENT DOES NOT REQUIRE STATES TO OFFER 35 DAYS OF ABSENTEE VOTING.........................................................17

    A.    States May Adopt Neutral Voting Rules That Do Not Severely Burden Voting Rights Or Flow From Discriminatory Intent..............18

        1.    *Anderson-Burdick* prohibits voting regimes that unjustifiably burden voting rights..............................................18

        2.    Equal protection bars voting changes passed with discriminatory intent ................................................................22

B. Ohio's Voting Regime Facilitates The Right To Vote, And Its Early-Voting Law Lacks Discriminatory Intent ...............................23

　　1. Ohio's laws facilitate both voting rights and state interests .....23

　　　　a. Rational-basis review applies .........................................23

　　　　b. Ohio's laws further legitimate interests.........................27

　　2. The Early-Voting Law lacks discriminatory intent .................31

C. The District Court's Contrary Analysis Was Mistaken .....................31

　　1. The district court mistakenly measured burdens .....................32

　　2. The district court wrongly downplayed Ohio's interests..........35

II. SECTION 2 OF THE VOTING RIGHTS ACT DOES NOT REQUIRE STATES TO OFFER 35 DAYS OF ABSENTEE VOTING..........................................................39

A. Section 2 Requires A Plaintiff To Identify An Alternative To A Challenged Practice And To Prove That The Practice Has Caused The State's Political Processes To Be Unequally Open ....................39

　　1. Challengers must identify an objective benchmark with which to compare a challenged practice ...................................41

　　2. Challengers must prove a causal connection between unequal political processes and the challenged practice...........43

　　3. Challengers must establish liability under the "totality of the circumstances" ........................................................................46

B. The Democratic Parties Failed To Identify An Objective Benchmark Or Prove Causation.........................................................47

　　1. The Democratic Parties offer no valid benchmark ..................47

　　2. The Democratic Parties did not prove that the Early-Voting Law caused Ohio's political processes to be unequally open ..52

C. The District Court Incorrectly Interpreted Section 2 ..........................55

ii

1.    The district court wrongly compared Ohio's current law to its old law (rather than a hypothetical benchmark) to find a racially disparate harm ............................................................ 55

2.    The district court's immediate jump to the *Gingles* factors ignored the statutory command to consider whether the Early-Voting Law *caused* unequal political processes ............. 58

CONCLUSION ...................................................................................... 61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF DISTRICT COURT RECORD

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)..............................................................*passim*

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015)....................................................................39

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   133 S. Ct. 2247 (2013)....................................................................51

*Baird v. Consol. City of Indianapolis*,
   976 F.2d 357 (7th Cir. 1992) ........................................................40

*Bartlett v. Strickland*,
   556 U.S. 1 (2009)....................................................................*passim*

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
   531 U.S. 356 (2001)........................................................................50

*Bennett v. Mollis*,
   590 F. Supp. 2d 273 (D.R.I. 2008) ..............................................37

*Bourland v. Hildreth*,
   26 Cal. 161 (1864) ..........................................................................6

*Brown v. Detzner*,
   895 F. Supp. 2d 1236 (M.D. Fla. 2012)........................................49

*Burdick v. Takushi*,
   504 U.S. 428 (1992)................................................................*passim*

*Burnham v. Superior Ct. of Cal.*,
   495 U.S. 604 (1990)........................................................................35

*Burns v. Fortson*,
   410 U.S. 686 (1973)........................................................................25

*Burson v. Freeman*,
   504 U.S. 191 (1992)....................................................................5, 6

*Citizens for Legislative Choice v. Miller*,
144 F.3d 916 (6th Cir. 1998) ..............................................................19

*City of Boerne v. Flores*,
521 U.S. 507 (1997).........................................................................50

*Clingman v. Beaver*,
544 U.S. 581 (2005)....................................................................21, 26

*Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.*,
652 F.3d 607 (6th Cir. 2011) ..............................................................24

*Crawford v. Bd. of Educ. of City of Los Angeles*,
458 U.S. 527 (1982)........................................................................38

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)...................................................................*passim*

*Fidell v. Bd. of Elections of N.Y.*,
343 F. Supp. 913 (E.D.N.Y.) ..............................................................22

*Frank v. Walker*,
768 F.3d 744 (7th Cir. 2014) .......................................................*passim*

*Georgia v. Ashcroft*,
539 U.S. 461 (2003).........................................................................57

*Goosby v. Osser*,
409 U.S. 512 (1973)....................................................................22, 24

*Green Party of Tennessee v. Hargett*,
791 F.3d 684 (6th Cir. 2015) .........................................................34, 35

*Gregory v. Ashcroft*,
501 U.S. 452 (1991).........................................................................52

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) .......................................................19, 25

*Growe v. Emison*,
507 U.S. 25 (1993)..........................................................................58

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) ..................................................................................19, 34

*Hayden v. Pataki*,
    449 F.3d 305 (2d Cir. 2006) ................................................................42, 43, 48

*Holder v. Hall*,
    512 U.S. 874 (1994) ..................................................................................*passim*

*Humphrey v. Lane*,
    728 N.E.2d 1039 (Ohio 2000) ..........................................................................38

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ..........................................................................3, 18, 23, 50

*Husted v. Ohio State Conference of NAACP*,
    135 S. Ct. 42 (2014) ...................................................................................2, 10

*Irby v. Va. State Bd. of Elections*,
    889 F.2d 1352 (4th Cir. 1989) ..........................................................................45

*Jackman v. Rosenbaum Co.*,
    260 U.S. 22 (1922) ............................................................................................26

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ............................................................................................5

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ..................................................................................44, 59

*Johnson v. Governor of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) ..........................................................42, 43, 50

*Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*,
    796 F.3d 576 (6th Cir. 2015) ............................................................................17

*Kramer v. Union Free Sch. Dist. No. 15*,
    395 U.S. 621 (1969) ..........................................................................................19

*Lawrence v. Blackwell*,
    430 F.3d 368 (6th Cir. 2005) ......................................................................21, 32

*Lehman v. McBride*,
   15 Ohio St. 573 (1863) ....................................................................................6

*Libertarian Party of Ohio v. Blackwell*,
   462 F.3d 579 (6th Cir. 2006) ...............................................................21, 31, 34

*Mallory v. Ohio*,
   173 F.3d 377 (6th Cir. 1999) ...............................................................45, 46, 60

*Marston v. Lewis*,
   410 U.S. 679 (1973)...................................................................................19, 25

*McDonald v. Bd. of Election Comm'rs*,
   394 U.S. 802 (1969).....................................................................................*passim*

*Mixon v. Ohio*,
   193 F.3d 389 (6th Cir. 1999) ...........................................................................18

*Mobile v. Bolden*,
   446 U.S. 55 (1980)............................................................................................39

*Moore v. Detroit Sch. Reform Bd.*,
   293 F.3d 352 (6th Cir. 2002) .....................................................................*passim*

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986)...........................................................................27, 35, 36, 37

*N.C. State Conference of the NAACP v. McCrory*,
   2016 WL 1650774 (M.D.N.C. Apr. 25, 2016) ............................................30, 56

*N.Y. State Conference of Blue Cross & Blue Shield Plans v.
   Travelers Ins. Co.*,
   514 U.S. 645 (1995)...........................................................................................51

*Ne. Ohio Coal. for the Homeless v. Husted*,
   696 F.3d 580 (6th Cir. 2012) .....................................................................19, 21

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003)...........................................................................................49

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009)....................................................................................43, 52

*O'Brien v. Skinner*,
    414 U.S. 524 (1974)......................................................................22

*O'Connor v. Donaldson*,
    422 U.S. 563 (1975)......................................................................31

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) .....................................................9, 24

*Ohio Council 8 Am. Fed'n of State v. Husted*,
    814 F.3d 329 (6th Cir. 2016) ...................................................*passim*

*Ohio State Conference of NAACP v. Husted*,
    2014 WL 10384647 (6th Cir. Oct. 1, 2014) ....................................11

*Ohio State Conference of NAACP v. Husted*,
    768 F.3d 524 (6th Cir. 2014) ...................................................*passim*

*Oregon v. Mitchell*,
    400 U.S. 112 (1970)......................................................................50

*Ortiz v. City of Philadelphia Office of the City Comm'rs
    Voter Registration Div.*,
    28 F.3d 306 (3d Cir. 1994) ...............................................43, 45, 60

*People ex rel. Twitchell v. Blodgett*,
    13 Mich. 127 (1865) .....................................................................6, 26

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)......................................................................23

*Prigmore v. Renfro*,
    356 F. Supp. 427 (N.D. Ala.)........................................................22

*Reno v. Bossier Parish Sch. Bd.*,
    520 U.S. 471 (1997)......................................................................46

*Reno v. Bossier Parish Sch. Bd.*,
    528 U.S. 320 (2000)...........................................................41, 55, 56, 60

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989)......................................................................34

*Rosario v. Rockefeller*,
410 U.S. 752 (1973)........................................................................................21

*Rosen v. Brown*,
970 F.2d 169 (6th Cir. 1992) ........................................................................20

*Shelby County v. Holder*,
133 S. Ct. 2612 (2013)..............................................................................57, 61

*Sheriff v. Gillie*,
136 S. Ct. 1594 (2016)....................................................................................43

*Spurlock v. Fox*,
716 F.3d 383 (6th Cir. 2013) ........................................................................31

*Storer v. Brown*,
415 U.S. 724 (1974)........................................................................................18

*T. Marzetti Co. v. Roskam Baking Co.*,
680 F.3d 629 (6th Cir. 2012) ........................................................................17

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
135 S. Ct. 2507 (2015)....................................................................................44

*Thornburg v. Gingles*,
478 U.S. 30 (1986)...................................................................................*passim*

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997)..........................................................................20, 21, 35

*United States v. Bass*,
404 U.S. 336 (1971)........................................................................................51

*United States v. Blewett*,
746 F.3d 647 (6th Cir. 2013) ..................................................................23, 31

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014)....................................................................................49

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)..................................................................................23, 33

*Weber v. Shelley*,
   347 F.3d 1101 (9th Cir. 2003) ........................................................... 34

*Wells v. Simonds Abrasive Co.*,
   345 U.S. 514 (1953) .......................................................................... 35

*Wesley v. Collins*,
   791 F.2d 1255 (6th Cir. 1986) ........................................................... 43

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001) .......................................................................... 49

*Williams-Yulee v. Florida Bar*,
   135 S. Ct. 1656 (2015) ........................................................... 29, 35, 36

## Statutes, Rules, and Constitutional Provisions

2 U.S.C. § 1 ...................................................................................... 52

2 U.S.C. § 7 ...................................................................................... 52

3 U.S.C. § 1 ...................................................................................... 52

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 1331 .................................................................................. 1

42 U.S.C. § 1983 ................................................................................ 49

52 U.S.C. § 10301 ........................................................................ *passim*

52 U.S.C. § 10301(b) ................................................................. 4, 53, 54

52 U.S.C. § 10502(d) ......................................................................... 37

52 U.S.C. § 20507(a) .......................................................................... 52

60 Ohio Laws 80 (1863) ....................................................................... 6

88 Ohio Laws 449 (1891) ...................................................................... 6

107 Ohio Laws 52 (1917) ...................................................................... 7

145 Ohio Laws (Part I) (1993).............................................................. 7

151 Ohio Laws (Part III) (2005) .................................................................8

Ohio Const. art. IV § 2 (1802) ................................................................5

Ohio Rev. Code § 9.68................................................................................38

Ohio Rev. Code § 3501.32(A) ...........................................................11, 24

Ohio Rev. Code § 3503.06(A) .........................................................7, 24, 25

Ohio Rev. Code § 3509.02(A) ...........................................................11, 24

Ohio Rev. Code § 3509.02(A)(1)-(8) (2004).........................................7

Ohio Rev. Code § 3509.03................................................................9, 11

Ohio Rev. Code § 3509.05(A) ...........................................................8, 12

S.B. 238 .................................................................................*passim*

Sub. S.B. 63 (2016).........................................................................25

U.S. Const. amend. XV, § 2.............................................................49

U.S. Const. amend. XXVI ...............................................................50

U.S Const., Art. I, § 4, cl. 1.............................................................51

## Other Authorities

Eldon Cobb Evans, *A History of the Australian Ballot System in the United States* 1-6 (1917) .................................................................5, 6

James McPherson, *Battle Cry of Freedom* 804 (1988)........................6, 27

John Fortier & Norman Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J. L. Reform 483 (2003) ..............................................................................7

Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 4 (1915) .........................................................................6, 7

L.E. Fredman, *The Australian Ballot: The Story of an American Reform* 24 (1968) .........................................................................5, 6

M.C. Dransfield, Annotation, *Validity of Absentee Voters' Laws*,
   97 A.L.R.2d 218 (1964)..........................................................................6

M.C. Dransfield, Annotation, *Construction and Effect of Absentee
   Voters' Laws*, 97 A.L.R.2d 257 (1964) .........................................7, 24

Mich. H.B. No. 4724 (Dec. 9, 2015) ..................................................4, 39

Ohio Am. Sub. H.B. 260, 128th G.A. (2009) ..........................................8

P. Orman Ray, *Absent-Voting Legislation, 1924-1925*, 20 Am. Pol.
   Sci. Rev. 347 (1926) ............................................................................7

Report of the Comm'n on Fed. Election Reform, *Building Confidence
   in U.S. Elections* (Sept. 2005), *available at*
   http://www.eac.gov/assets/1/AssetManager/Exhibit%20M.PDF......................29

Robert Stein & Greg Vonnahme, *Early, Absentee, and Mail-In Voting,
   in Handbook of Electoral Behavior* 183 (Jan Leighley ed., 2010)................7, 49

## STATEMENT REGARDING ORAL ARGUMENT

Because this case raises important issues under the Constitution and Section 2 of the Voting Rights Act, Ohio Secretary of State Jon Husted and Ohio Attorney General Mike DeWine request oral argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331.  It entered a final judgment on May 24, 2016.  Judgment, R.118, PageID#6243.  On May 26, 2016, the Defendants—Ohio Secretary of State Jon Husted and Ohio Attorney General Mike DeWine ("State" or "Ohio")—appealed.  Notice, R.119, PageID#6244.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In 2014, Ohio amended its absentee-voting schedule by eliminating a voting week beginning 35 days before Election Day during which voters could register and vote simultaneously.  S.B. 238 (amending Ohio Rev. Code § 3509.01) ("Early-Voting Law").  After this change, Ohio's voting calendar remains one of the most expansive in the country—starting 29 days before Election Day.  Yet the district court enjoined the Early-Voting Law under the Fourteenth Amendment and Section 2 of the Voting Rights Act.  This appeal asks:

1.    Do Ohio's early-voting options unjustifiably burden the right to vote in violation of the Fourteenth Amendment?

2.    Do Ohio's early-voting options "result" in the "denial or abridgment" of the "right to vote" "on account of race" in violation of Section 2?

## INTRODUCTION

Ohio is a national leader in making voting easy.  It permits absentee voting beginning 29 days before an election.  This is the tenth-longest period in the

country.  Trende Rep., R.127-14, PageID#6609-11.  Thirteen States, including New York, Michigan, and Kentucky, require voters to vote only on Election Day. *Id.*  Ohio also mails absentee-ballot applications to almost all registered voters, who may vote by mail during this period.  Damschroder Tr., R.104, PageID#5397-98.  Almost no other State has a similar application-mailing program, and three States require voters to use *only* mail.  Trende Rep., R.127-14, PageID#6610, 6685.  Further, Ohio offers 23 days of *in-person* voting—including two Saturdays, two Sundays, and evening hours—for voters who "distrust[]" the mail, Op., R.117, PageID#6165, who vote through "Souls to the Polls," Butcher Tr., R.96, PageID#3646, or who merely prefer to save on postage.  Calendar, R.127-14, PageID#6769-70.  These in-person hours, too, rank Ohio within the top ten. Trende Rep., R.127-14, PageID#6612, 6629.

While the district court "commended" Ohio for its "national leadership in voting opportunities," it invalidated the Early-Voting Law on the belief that only this Court could "change course" from *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014).  Stay Order, R.125, PageID#6302, 6304. Not so.  *NAACP* lacks precedential value because it was vacated and arose in a preliminary-injunction posture.  It lacks persuasive value because of the reason for the vacatur—a Supreme Court stay.  *Husted v. Ohio State Conference of NAACP*, 135 S. Ct. 42 (2014).

Regardless, whether assessed under the Fourteenth Amendment or Section 2, the decision below suffers a fatal flaw: It used a "retrogression" analysis that evaluated the impacts on African-American voters of changing from Ohio's *old* 35-day schedule to its *current* 29-day schedule. Op., R.117, PageID#6164, 6219. This was legally mistaken and practically unsound.

Legally, neither the Fourteenth Amendment nor Section 2 permits this "retrogression" inquiry. The Fourteenth Amendment asks not whether a *change* from 35 days to 29 days *modestly* burdens *some* voters; it asks whether the current system in its *entirety* (including 29 days of voting) *substantially* burdens *all* voters. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202-03 (2008) (Stevens, J., op.); *Burdick v. Takushi*, 504 U.S. 428, 436-37 (1992). It does not. Voters have no "right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969). That is not to say that minor changes are free from constitutional scrutiny. But the Constitution requires proof that such changes arose from discriminatory animus. *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985). That is missing here. Op., R.117, PageID#6237.

As for Section 2, "[r]etrogression is not the inquiry" because Congress reserved old-to-new comparisons for Section 5, under which States with a discriminatory history had to "preclear[]"changes. *Holder v. Hall*, 512 U.S. 874, 884 (1994) (Kennedy, J., op). Section 2 instead measures the current schedule

3

against a "benchmark" identifying the number of voting days that *ought* to exist. *Id.* at 880.  The district court did not even try to identify that benchmark.  Further, Section 2 asks whether Ohio's "political processes" are "equally open."  52 U.S.C. § 10301(b).  Ohio's expansive options achieve that goal.  In 2014, African Americans registered and voted at the *statistically same* rates as whites under a calendar with fewer non-traditional voting hours than the one challenged in this case.  Hood Rebuttal, R.127-18, PageID#7366-67.

Practically, the district court's old-to-new approach for each individual voting rule would shut down the "laboratories of democracy."  "No state has exactly equal registration rates, exactly equal turnout rates, and so on, at every stage of its voting system."  *Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014).  Considering each rule *in isolation* would "dismantle every state's voting apparatus."  *Id.*  This approach also transforms the Fourteenth Amendment and Section 2 into one-way ratchets that discourage election experimentation.  In 2005, Ohio adopted one of the most expansive voting regimes in this country; it should not be punished for broadly protecting voting rights by now using those very protections against it.  That would discourage other States, like New York or Michigan, from following Ohio's lead.  *Cf.* Mich. H.B. No. 4724 (Dec. 9, 2015) (pending bill for no-excuse absentee voting).

## STATEMENT OF THE CASE

**A.    Throughout This Nation's History, States Have Permitted Most Voters To Vote Only On Election Day**

States have traditionally voted only on Election Day.  On that day, "the Colonies mostly continued the English traditions of voting by a show of hands or by voice—*viva voce* voting."  *John Doe No. 1 v. Reed*, 561 U.S. 186, 224 (2010) (Scalia, J., concurring in judgment).  After the Revolution, States gradually shifted to paper ballots.  Eldon Cobb Evans, *A History of the Australian Ballot System in the United States* 1-6 (1917).  Ohio's first constitution, for example, required "elections [to] be by ballot."  Ohio Const. art. IV § 2 (1802).  Voters initially handwrote votes on paper, but political parties soon pre-printed ballots for their candidates using "flamboyant colors, distinctive designs, and emblems so that they could be recognized" at the polls.  *Burson v. Freeman*, 504 U.S. 191, 200 (1992) (plurality op.).  This voting method remained common in the 1800s.  *Id.* at 200-04.

During this time, Election Day was "'not a very pleasant spectacle.'"  *Id.* at 202 (citation omitted).  "As the elector started his journey to the polls, he was met by various party ticket peddlers 'who were only too anxious to supply him with their'" ballots.  *Id.* (citation omitted).  With peddlers "loitering outside the polling place there was bound to be some scuffling and intimidation."  L.E. Fredman, *The Australian Ballot: The Story of an American Reform* 24 (1968).  "Sometimes the disorder was spontaneous and the result of partisan zeal; often it was deliberately

contrived to frighten away decent people and magnify the coerced vote." *Id.* The use of identifiable ballots also "opened the door to bribery," Evans, *supra*, at 11, with candidates all too willing to "pick[] up the saloon bills," Fredman, *supra*, at 23. By the late 1800s, most States (like Ohio) had had enough. They eliminated these abuses through democratic experimentation with the "Australian" system—a system characterized by one official ballot and secret voting. *Burson*, 504 U.S. at 202-05 (plurality op.); 88 Ohio Laws 449, 458-62 (1891).

Also during the 1800s, voting occurred only at the polls. Civilian absentee voting did not exist, and many constitutions required in-person voting. M.C. Dransfield, Annotation, *Validity of Absentee Voters' Laws*, 97 A.L.R.2d 218 § 2 (1964). Despite those provisions, most States adopted another "bold experiment in democracy" during the Civil War—*military* absentee voting that allowed soldiers fighting in the field to vote back home. James McPherson, *Battle Cry of Freedom* 804 (1988); Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 4 (1915). Ohio passed its law in 1863. 60 Ohio Laws 80, 80-84 (1863). Of the 50,000 or so Ohio soldiers who voted absentee in 1864, some 41,000 voted for President Lincoln. Benton, *supra*, at 78. Constitutional attacks were soon lodged against these laws. The Ohio Supreme Court upheld Ohio's law, *Lehman v. McBride*, 15 Ohio St. 573 (1863), but many other courts invalidated theirs, *People ex rel. Twitchell v. Blodgett*, 13 Mich. 127 (1865); *Bourland v. Hildreth*, 26 Cal.

161 (1864). This constitutional question became moot when most States discontinued these laws at war's end. Benton, *supra*, at 314-16.

Absentee voting slowly took root during the 1900s. By 1924, most States, again through democratic experimentation, offered some absentee voting. P. Orman Ray, *Absent-Voting Legislation, 1924-1925*, 20 Am. Pol. Sci. Rev. 347, 347 (1926). "Most of these laws were limited." John Fortier & Norman Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J. L. Reform 483, 504 (2003). Ohio permitted absentee voting for those who could prove an "unavoidable absence." 107 Ohio Laws 52, 52 (1917). States gradually expanded these laws during the 1900s, adding, among others, disability and religious observance to the list of qualifying "excuses." *McDonald*, 394 U.S. at 809-11 & nn.8-9; M.C. Dransfield, Annotation, *Construction and Effect of Absentee Voters' Laws*, 97 A.L.R.2d 257 § 15 (1964). No-excuse absentee voting is of very recent vintage. Robert Stein & Greg Vonnahme, *Early, Absentee, and Mail-In Voting, in Handbook of Electoral Behavior* 183 (Jan Leighley ed., 2010).

**B.    Ohio Has Used No-Excuse Absentee Voting Since 2006**

By 2004, Ohioans could vote absentee if they asserted one of several reasons. Ohio Rev. Code § 3509.02(A)(1)-(8) (2004). These ballots were available 35 days before Election Day, 145 Ohio Laws (Part I) 1389, 1406 (1993), and five days before the end of voter registration (30 days before an election), Ohio

Rev. Code § 3503.06(A). That left a five-day overlap between when absentee voters could vote and when all voters had to register. Absentee voters could cast ballots by mail or in person at boards of elections. *Id.* § 3509.05(A).

In 2004, Ohio experienced long lines at the polls. Anthony Tr., R.96, PageID#3738. The next year, it adopted another "bold experiment in democracy," McPherson, *supra*, at 804, by permitting "[a]ny qualified elector [to] vote by absent voter's ballots at any election," 151 Ohio Laws (Part III) 5267, 5276 (2005) (amending Ohio Rev. Code § 3509.02(A)). Under this "no-excuse" absentee voting, all voters could vote by mail or in person. Ohio Rev. Code § 3509.05(A). The change did not adjust the preexisting timelines that had existed for absentee voting, and it appears that the General Assembly did not even contemplate at this time what the proper voting calendar should be.

Between 2006 and 2012, Ohio's 88 boards of elections adopted conflicting days and hours for in-person absentee voting. Damschroder Tr., R.104, PageID#5411. Many officials called for uniformity. Two Democrats, for example, sponsored a bill adopting a 21-day schedule. Ohio Am. Sub. H.B. 260, 128th G.A. (2009). The Ohio Association of Elections Officials ("OAEO")—whose trustees include 10 Democrats and 10 Republicans from large, medium, and small counties—also urged a 21-day schedule. Ward Tr., R.103, PageID#5300, 5308, 5313, 5321-22. When voters register, the OAEO reasoned, boards mail them

8

acknowledgment cards to confirm their address. *Id.* PageID#5310. Many cards come back as undeliverable, and the relevant voters must vote provisionally because they may be ineligible. *Id.* PageID#5310, 5312. Voters who register and vote simultaneously, however, would vote before boards would receive the cards back from "undeliverable" addresses. *Id.* PageID#5313. The task force recommended starting voting nine days after registration's close because most undeliverable cards would have been returned by then. *Id.*

Ohio passed a law in 2012 setting a voting schedule along these lines, but repealed the law after it became subject to a referendum. *Obama for Am. v. Husted*, 697 F.3d 423, 427 (6th Cir. 2012). Another law had, however, amended Ohio Rev. Code § 3509.03 to end in-person voting for *non-military* voters at 6:00 p.m. on the Friday before the election (rather than on the Monday before). *Id.* This Court affirmed a preliminary injunction against that change (and required Ohio to hold in-person voting on the last three days) on the ground that equal protection barred Ohio from distinguishing between military and non-military voters in a way deemed to burden voting rights. *Id.* at 432.

In 2013, another OAEO task force recommended shortening absentee voting to start on the day after registration's close 29 days before the election (rather than 21 days before). Ward Tr., R.103, PageID#5317-18. This task force, comprised of four Republicans and four Democrats, "was a bipartisan group where we basically

9

took off our R hat and our D hat, put on our election official [hat], and decided what's best for the voters." *Id.* PageID#5316. It reached 29 days as a compromise. *Id.* PageID#5317-18. As one Democratic official said, "I saw the problems that [the schedule] was giving to some of my smaller contemporaries across the state and so I agreed to compromise and was hoping that they would also agree to compromise." Anthony Tr., R.96, PageID#3781.

Many reasons supported the change. Boards are busy at this time. Ward Tr., R.103, PageID#5303-04. They are processing the most registrations, completing registration rolls, finalizing ballots, testing voting machines, and processing absentee-ballot applications. *Id.* PageID#5303-09; Poland Tr., R.104, PageID#5389; Munroe Tr., R.102, PageID#4959. In addition, same-day registration and voting required boards to hire temporary staff or have staff work overtime. Poland Tr., R.104, PageID#5359; Munroe Tr., R.102, PageID#4942. Officials also viewed this time as increasing fraud potential. Ward Tr., R.103, PageID#5329; Damschroder Tr., R.104, PageID#5448.

In 2014, Ohio passed the Early-Voting Law to change the start date for absentee voting to 29 days before the election, on the day after registration's close. Ohio Rev. Code § 3509.01. Before the 2014 election, the NAACP challenged the Early-Voting Law. A panel upheld a preliminary injunction against it, *NAACP*, 768 F.3d at 561, but the Supreme Court stayed the injunction, *NAACP*, 135 S. Ct.

10

42.  The panel vacated its decision.  *Ohio State Conference of NAACP v. Husted*, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014).  During the 2014 election, African Americans registered and voted at the *same* rates as whites.  Hood Tr., R.99, PageID#4390; Hood Rebuttal, R.127-18, PageID#7366-67.  *NAACP* then settled:  Ohio adopted another Sunday of voting; plaintiffs dismissed their claim against the 29-day voting period.  Settlement, R.127-14, PageID#6775.

### C.    Ohio's Voting Regime Contains Expansive Options

Ohioans have two voting options: Election Day voting or absentee voting. Ohio Rev. Code § 3509.02(A).  On Election Day, voters may vote from 6:30 a.m. until 7:30 p.m.  *Id.* § 3501.32(A).  This remains "the mode of voting that most voters still use."  Damschroder Tr., R.104, PageID#5393, 5419.  In recent elections, voters cast two-thirds or more of their votes on Election Day.  Hood Tr., R.99, PageID#4333; Hood Rep., R.127-15, PageID#7260.  In 2012, voters waited, on average, ten minutes to vote.  Trende Rep., R.127-14, PageID#6707.

Absentee voting begins 29 days before an election.  Ohio Rev. Code § 3509.01.  To vote absentee by mail, voters must submit absentee-ballot applications to boards by a few days before the election.  *Id.* § 3509.03.  Those applications are widely available.  Damschroder Tr., R.104, PageID#5397.  The Secretary has mailed them to almost all registered voters in the last two federal elections (and will do so again in 2016).  *Id.* PageID#5397-98.  Voters may mail

11

the applications to the board, personally return them, or have anyone else return them.  *Id.* PageID#5406.  Absentee voters have two options to vote—by mail or in person.  Ohio Rev. Code § 3509.05(A).

In recent elections, at least two-thirds of absentee voters voted by mail.  Hood Tr., R.99, PageID#4333; Hood Rep., R.127-15, PageID#7260.  Voters may obtain absentee ballots by mail or at boards of elections.  Damschroder Tr., R.104, PageID#5406, 5408.  They may return the ballots by mail, in person, or through a family member.  *Id.* PageID#5407.  Mail voters may track the status of their ballots at board websites.  *Id.* PageID#5421.

Absentee in-person voting remains the least-used option.  Hood Tr., R.99, PageID#4333; Hood Rep., R.127-15, PageID#7260.  The schedule for in-person hours depends on the election.  Presidential elections offer the most.  In 2016, voters may vote *in person* on 23 of the 29 absentee-voting days, including on two Saturdays, on two Sundays, and on weekday evenings.  Calendar, R.127-14, PageID#6769-70.

All told, these options make voting easier in Ohio than in most States.

### D.    The District Court Enjoined The Early-Voting Law

Waiting until after the *NAACP* case settled, the Ohio Democratic Party, county Democratic parties, and three people (the "Democratic Parties") again sued to challenge the Early-Voting Law.  They also challenged laws: (1) establishing

one voting location per county; (2) regarding the number of voting machines per county; (3) regarding the mailing of absentee-ballot applications; and (4) regarding absentee and provisional ballots.  Op., R.117, PageID#6124.

After a bench trial, the district court invalidated the Early-Voting Law under equal protection and Section 2, but rejected all other claims.  *Id.* PageID#6242. (Since then, another court has disagreed with the decision to uphold the absentee-ballot and provisional-ballot laws.  *Ne. Ohio Coal. for the Homeless v. Husted*, No. 16-3603.)  To invalidate the Early-Voting Law, the district court relied on the vacated *NAACP* decision.  While allegedly using *NAACP* only for its "persuasive" value, Op., R.117, PageID#6152, the court treated the opinion as Sixth Circuit precedent and cited it some 30 times, *id.* PageID#6154-78, 6217-29.

The court first held that the Early-Voting Law's *changes* violated equal protection.  *Id.* PageID#6153-6179.  It found that the changes had a disparate, albeit modest, impact on African Americans.  *Id.* PageID#6157-64.  Ohio's other options did not alleviate these burdens, the court reasoned, because "anecdotal evidence" showed that African Americans "are distrustful of voting by mail" and because mail requires postage.  *Id.* PageID#6165-66.  The court then held that Ohio's interests (such as reducing administrative burdens or deterring fraud) did not outweigh the modest burdens.  *Id.* PageID#6171-79.  Yet it rejected the claim that the Early-Voting Law was intentionally discriminatory.  *Id.* PageID#6237.

The court next held that the Early-Voting Law violated Section 2. *Id.* PageID#6215-30. It disclaimed any need to "identify an objective benchmark" with which to compare Ohio's schedule. *Id.* PageID#6219. And it said it could not use a "retrogression analysis," but "compared" "prior law" to "current law" to enjoin the Early-Voting Law and reinstate the old schedule. *Id.*

The court granted Ohio a stay for an August special election, but not the November election. Stay Order, R.125, PageID#6308. The court "commended" Ohio's "leadership in voting," *id*. PageID#6302, but said it was the "province" of the Sixth Circuit to disavow *NAACP*, *id*. PageID#6304.

## SUMMARY OF ARGUMENT

I. Ohio's expansive early-voting options satisfy the Fourteenth Amendment. That amendment includes both a right-to-vote framework (the "*Anderson-Burdick*" framework) and a traditional equal-protection framework. The *Anderson-Burdick* framework requires courts to balance a State's interests in its laws against the burdens they impose on the "right to vote." Strict scrutiny applies to discriminatory laws that impose severe burdens; a flexible middle scrutiny applies to laws that impose substantial burdens; and an "important-regulatory-interest" test analogous to rational-basis review applies to laws that impose modest burdens. The traditional equal-protection framework, by contrast,

requires proof that a neutral law has a disparate impact on a protected class and was enacted with discriminatory intent against that class.

Ohio's early-voting options satisfy these standards. Under *Anderson-Burdick*, rational-basis review applies because (1) voters have no protected right to absentee ballots; (2) Ohio's laws are neutral; (3) its smorgasbord of early-voting options facilitates voting; (4) its requirement to register and vote at different times imposes minimal burdens, and (5) its laws impose "ordinary" burdens when assessed from a historical or modern perspective. In all events, Ohio satisfies middle-tier scrutiny because it has reasonable reasons for its schedule, including administrative and cost concerns, fraud and public-confidence concerns, and concerns with giving voters all information. Finally, the district court correctly found that the Early-Voting Law lacked discriminatory intent.

The district court assessed the voting burdens and state interests wrongly under *Anderson-Burdick*. As for burdens, it mistakenly invalidated the Early-Voting Law facially by examining impacts on *some voters* rather than *all voters*. It mistakenly measured the burdens from the law's *changes* rather than Ohio's *entire* regime. It mistakenly used middle scrutiny based on *modest*, rather than *substantial*, burdens. And it mistakenly ignored binding precedent and other state laws. As for state interests, the court said Ohio failed to present "sufficient" evidence—scrutiny that the Supreme Court has repeatedly cautioned against.

II.    Ohio's expansive early-voting options satisfy Section 2.  Section 2 bars voting practices that "result" in a denial or abridgment of the right to vote on account of race.  To determine whether a practice violates Section 2, vote-dilution cases follow a three-step approach that makes sense here.  First, courts ask whether a challenged practice has a disparate impact on minorities by *comparing* its impact to the impact on minorities from a hypothetical alternative that the State should instead adopt (e.g., the remedy if the State is found liable).  In some cases that "benchmark" practice will be far from obvious, and if no workable standard exists to choose it, Section 2 does not apply.  Second, courts ask whether the challenged practice has caused the State's political processes to be "unequally open" to certain racial groups.  This requires both a general finding that the State's processes are in fact unequally open and a specific finding that the challenged practice has caused the inequality.  Third, only if these first two steps are satisfied should a court proceed to the final step considering the totality of the circumstances.

This case fails at steps one and two; step three is not even reached.  At step one, the Democratic Parties have not shown an objective benchmark against which to compare Ohio's early-voting schedule.  Ohio's schedule *benefits*—not *harms*— African Americans compared to the vast majority of alternatives.  The schedule would beat most other current state schedules.  And it exceeds the only historically rooted benchmark:  Election Day voting.  At step two, the Democratic Parties have

16

not shown that Ohio's political processes are unequally open. To the contrary, African Americans registered and voted at the statistically same rates as others in 2014, and Ohio has added even more non-traditional hours since then.

The district court mistakenly held otherwise. At step one, the court wrongly asserted that it need not identify any hypothetical benchmark, but then used the old schedule as the benchmark by comparing the new one to it. This "retrogression" approach is reserved for Section 5. At step two, the court did not even examine whether Ohio's political processes were equally open, or find that the Early-Voting Law had caused that inequality; instead, it jumped to a totality-of-the-circumstances inquiry that it never should have reached.

## STANDARD OF REVIEW

This Court reviews "'the district court's findings of fact for clear error and its conclusions of law de novo.'" *Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 585 (6th Cir. 2015) (citation omitted). "Mixed questions of law and fact are also subject to de novo review." *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012).

## ARGUMENT

## I. THE FOURTEENTH AMENDMENT DOES NOT REQUIRE STATES TO OFFER 35 DAYS OF ABSENTEE VOTING

The Fourteenth Amendment permits laws that neither severely burden voting rights nor flow from discriminatory animus. Ohio passes both tests.

17

### A.    States May Adopt Neutral Voting Rules That Do Not Severely Burden Voting Rights Or Flow From Discriminatory Intent

Elections raise competing concerns.  Since the founding, States have set the ground rules.  "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).  Since the 1960s, courts have found a general right to vote "'implicit in our constitutional system.'"  *Mixon v. Ohio*, 193 F.3d 389, 402 (6th Cir. 1999) (citation omitted).

To balance these interests, the Supreme Court recognizes two Fourteenth Amendment claims.  First, a right-to-vote claim (an "*Anderson-Burdick*" claim) bars voting laws that unduly burden the right to vote when considered with the *entire voting regime*.  *Burdick*, 504 U.S. at 433-34; *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983).  Second, an equal-protection claim bars *voting changes* that disparately affect a protected class and arise from discriminatory animus. *Hunter*, 471 U.S. at 227-28.

### 1.    *Anderson-Burdick* prohibits voting regimes that unjustifiably burden voting rights

*Anderson-Burdick* requires courts to balance state interests against protected rights.  *Crawford*, 553 U.S. at 190 (Stevens, J., op.).  This "balancing" governs all voting laws, including those addressing "'the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself.'"

*Burdick*, 504 U.S. at 433 (citation omitted). Under that test, courts have upheld laws requiring voters to register before Election Day, *Marston v. Lewis*, 410 U.S. 679, 680-81 (1973), or to vote on that day, *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004). They have voided laws requiring voters to pay poll taxes, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666-67 (1966), or to own property, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-33 (1969). As these examples show, *Anderson-Burdick* balancing applies even to *neutral* laws treating voters equally, *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (*NEOCH*), illustrating that it resembles substantive due process more than equal protection.

This balancing follows two steps. At step one, courts measure a burden's size. At step two, courts apply a corresponding review standard. *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998).

a. *Measuring The Burden*. To measure a burden, courts look to many factors, including the law's neutrality, its place in the system, its impact on all parties, and its novelty.

*Neutrality*. "A burden that falls unequally" on certain parties, candidates, or voters imposes greater burdens, *Anderson*, 460 U.S. at 793, than "neutral regulations," *Burdick*, 504 U.S. at 438. For example, this Court has held that ballot restrictions applicable to *all* judicial candidates imposed minimal burdens, *Ohio*

19

*Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016), whereas ballot restrictions applicable *only* to independents imposed severe ones, *Rosen v. Brown*, 970 F.2d 169, 175-76 (6th Cir. 1992).

*Entire System*.  Courts assess a law's impact *together* with—not in *isolation* from—the voting "system."  *Burdick*, 504 U.S. at 436.  A seemingly burdensome law in isolation may impose only modest burdens when viewed with an entire system.  For example, a Hawaii law barring "write-in" votes seemed severe, but imposed "limited" burdens when considering that Hawaii "provide[d] for easy access to the ballot."  *Id.* at 434-37.  Likewise, ballot restrictions on political parties imposed minimal burdens because Ohio law gave those parties "many other opportunities to champion [their] nominee[s]."  *Ohio Council*, 814 F.3d at 335.

*All Parties*.  For facial attacks, courts "consider only the statute's broad application to all" parties.  *Crawford*, 553 U.S. at 202-03 (Stevens, J., op.).  Thus, in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), a lower court asserted that laws banning "fusion" candidates (those supported by two parties) severely burdened minor parties.  *Id.* at 360.  The Court reversed because these special burdens did not show greater burdens as a whole, explaining that many ordinary "features of our political system . . . make it difficult for third parties to succeed in American politics."  *Id.* at 362.  This Court similarly applied minimal scrutiny to a law that allegedly "place[d] significant burdens on independent

20

candidates" (as compared to others), because the law imposed modest burdens "considering Ohio's election scheme as a whole." *Lawrence v. Blackwell*, 430 F.3d 368, 373-74 (6th Cir. 2005).

*Commonality*.  Courts lastly consider whether a voting law's burdens are "ordinary and widespread." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005).  When the Court upheld the fusion bans, for instance, it noted that fusion had become "the exception" nationally.  *Timmons*, 520 U.S. at 356-57.  Conversely, this Court voided ballot-access laws that were some of the "most burdensome" nationally. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 589 (6th Cir. 2006).

b. *Review Standard*. The more severe the burden, the more severe the standard of review.  At one end, "strict scrutiny" governs discriminatory laws imposing "severe" burdens. *NEOCH*, 696 F.3d at 592.  The Supreme Court strictly scrutinized laws that "totally denied the electoral franchise," *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973), and this Court did so for laws prohibiting minor parties from gaining ballot access, *Libertarian Party*, 462 F.3d at 588-90.

In the middle sit laws imposing burdens that, while not severe, are substantial.  For these, courts balance benefits and burdens, *Ohio Council*, 814 F.3d at 338, but a State need not present "elaborate, empirical verification," *Timmons*, 520 U.S. at 364.  Fraud concerns saved Indiana's photo-identification

21

law, for example, even though "the record contain[ed] no evidence" of that type of fraud in Indiana's history. *Crawford*, 553 U.S. at 194 (Stevens, J., op.).

At the other end, laws imposing modest burdens need only further "'important regulatory interests.'" *Burdick*, 504 U.S. at 434 (citation omitted). This is "akin to rational-basis review," *Ohio Council*, 814 F.3d at 338, so the law "will be set aside only if no grounds can be conceived" to justify it, *McDonald*, 394 U.S. at 809. An absentee-ballot denial triggers this review because voters have no "right to receive absentee ballots." *Id.* at 807. When a college student's school plans and a flight attendant's work plans forced them out-of-state on Election Day, those burdens did not trigger higher scrutiny for laws denying them absentee ballots. *Fidell v. Bd. of Elections of N.Y.*, 343 F. Supp. 913, 915 (E.D.N.Y.), *aff'd* 409 U.S. 972 (1972); *Prigmore v. Renfro*, 356 F. Supp. 427, 432 (N.D. Ala.), *aff'd* 410 U.S. 919 (1972). Instead, higher scrutiny applies only if the State "is both physically preventing [challengers] from going to the polls and denying them alternative means of casting their ballots." *O'Brien v. Skinner*, 414 U.S. 524, 533 (1974) (Marshall, J., concurring); *Goosby v. Osser*, 409 U.S. 512, 521 (1973).

### 2. Equal protection bars voting changes passed with discriminatory intent

If challengers cannot show that a law (considered with the *entire regime*) burdens the right to vote, they may assert a traditional equal-protection challenge

to the law (considered *alone*). They must show that it "produces disproportionate effects along racial lines," and originates with "'discriminatory intent.'" *Hunter*, 471 U.S. at 227 (citation omitted). That is not easy. "A disproportionate effect does not violate the Equal Protection Clause, even if it was foreseen." *United States v. Blewett*, 746 F.3d 647, 659 (6th Cir. 2013) (en banc). The law must arise "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

## B. Ohio's Voting Regime Facilitates The Right To Vote, And Its Early-Voting Law Lacks Discriminatory Intent

Ohio's laws satisfy *Anderson-Burdick* because, *taken together*, they impose no burdens on voting. Its Early-Voting Law satisfies equal protection because, *taken alone*, it lacks discriminatory intent.

### 1. Ohio's laws facilitate both voting rights and state interests

Rational-basis review applies to Ohio's laws under *Anderson-Burdick*, but those laws also satisfy higher scrutiny.

#### a. Rational-basis review applies

Ohio's voting laws trigger rational-basis review. *First*, only burdens on *protected* rights count. Just as political parties have no protected "right to have their nominees designated as such on the ballot," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 n.7 (2008), voters have no protected right to absentee ballots, *McDonald*, 394 U.S. at 807-08. Absentee voting has

always been "a privilege." Dransfield, 97 A.L.R.2d 257 § 3. Only if the *State* "absolutely prohibits" a voter from voting on Election Day could an absentee-ballot denial burden protected rights. *Goosby*, 409 U.S. at 521. Yet the Democratic Parties did not identify a single person whom Ohio absolutely prohibits from voting. Resp., R.127-8, PageID#6468.

*Second*, Ohio laws are *neutral*. Ohio requires *all* voters to register 30 days before the election. Ohio Rev. Code § 3503.06(A). It allows *all* voters to vote absentee over a 29-day period. *Id.* § 3509.02(A). And it gives *all* voters thirteen hours to vote on Election Day. *Id.* § 3501.32(A).

This distinguishes *Obama for America*. That case suggested that a *discriminatory* law granting more days to *military* personnel likely would not survive constitutional scrutiny. 697 F.3d at 436. But if "the State had enacted a generally applicable, nondiscriminatory voting regulation that limited in-person early voting for all Ohio voters, its 'important regulatory interests' would likely be sufficient to justify the restriction." *Id.* at 433-34 (citation omitted). *Obama for America*'s carve-out for neutral laws, not its reasoning for discriminatory laws, applies. Regardless, *Obama for America* is a non-binding, preliminary-injunction decision. *Cf. Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.*, 652 F.3d 607, 626 (6th Cir. 2011) (disagreeing with preliminary-injunction

opinion), *overruled by Schuette v. Coal. to Defend Affirmative Action*, 134 S. Ct. 1623 (2014).

*Third*, Ohio's early-voting calendar *facilitates* voting. It should be "obvious that a federal court [cannot] decree weekend voting, multi-day voting, all-mail voting, or Internet voting." *Griffin*, 385 F.3d at 1130. For most voters, Ohio's expansive options are irrelevant. Only 11% of voters, at most, have used in-person absentee voting in recent elections. Hunt Tr., R.99, PageID#4333; Hood Rep., R.127-15, PageID#7261. Of that number, most voted closer to Election Day on days Ohio still offers. *Id.* PageID#7262. And for communities who use "Souls to the Polls," Butcher Tr., R.96, PageID#3646, Ohio offers two Sundays of voting.

*Fourth*, the requirement to register and vote on separate occasions imposes minimal burdens. Legally, binding precedent upholds laws requiring voters to register *50 days* before they vote. *Marston*, 410 U.S. at 680-81; *Burns v. Fortson*, 410 U.S. 686, 686-87 (1973). Ohio allows registration up to *30 days* before an election. Ohio Rev. Code § 3503.06(A). Factually, registration is easy. During recent elections, the "vast, vast majority" of registrations occurred before voting. Hood Tr., R.99, PageID#4336; Hood Rep., R.127-15, PageID#7262. Registration cards are ubiquitous, and voters can return them by many means. Perlatti Tr., R.97, PageID#4067. Ohio also recently passed an online-registration law. Sub. S.B. 63 (2016).

25

*Finally*, from a historical or a modern perspective, Ohio laws impose only "ordinary" burdens. *Clingman*, 544 U.S. at 593. Historically, as noted, States required voters to vote on one day. Election Day is a well-known phrase; "Election Month" is not. Indeed, when States initially tried absentee voting, courts invalidated that experiment. *E.g., Blodgett*, 13 Mich. at 148. Can what was constitutionally *prohibited* in many States at the Fourteenth Amendment's adoption really be constitutionally *compelled* today? As Justice Holmes remarked, "[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922).

Today, burdens in Ohio are minimal when compared to the rest of the country. As the district court noted, "Ohio's national leadership in voting opportunities is to be commended." Stay Order, R.125, PageID#6302. Ohio remains in the top ten States for the most early-voting hours. Trende Rep., R.127-14, PageID#6629. Similarly, most States, like Ohio, do not permit same-day voting and registration. *Id.* PageID#6635.

In sum, "[i]ronically, it is [Ohio's] willingness to go further than many States in extending the absentee voting privileges . . . that has provided [challengers] with a basis for arguing that the provisions . . . deny them a more convenient method of exercising the franchise." *McDonald*, 394 U.S. at 810-11.

26

Rather than a burden, however, Ohio's voting regime is a "laudable state policy." *Id.* at 811. Its options exceed the options applauded by *McDonald* and available in most States. Ohio should be lauded, not sued, for its "bold experiment in democracy." McPherson, *supra*, at 804. Rational-basis review applies.

### b.    Ohio's laws further legitimate interests

Ohio laws further "legitimate state interests 'sufficiently weighty to justify'" them. *Crawford*, 553 U.S. at 191 (Stevens, J., op.) (citation omitted). A justification's sufficiency is a "'legislative fact'" that must be accepted if reasonable, not an "'adjudicative fact[]'" subject to courtroom factfinding. *Frank*, 768 F.3d at 750. The contrary rule "would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). That is why *Crawford* accepted the State's fraud concerns even though it identified no evidence—none—of fraud ever occurring in the State in the way it sought to prevent. 553 U.S. at 194 (Stevens, J., op.). Here, many interests support Ohio.

*Administrative Burdens*. Ohio must balance early-voting options with the burdens on boards of elections. Those boards have "a lot of things going on" 35 days before an election. Ward Tr., R.103, PageID#5303; Damschroder Tr., R.104, PageID#5451. They are finalizing ballots, which can change 40 days before the election. Ward Tr., R.103, PageID#5303; Munroe Tr., R.102, PageID#4959;

Poland Tr., R.104, PageID#5357.   They are running ballots through voting machines for "logic and accuracy" testing.   Ward Tr., R.103, PageID#5303-04; Munroe Tr., R.102, PageID#4959; Poland Tr., R.104, PageID#5357.   They are processing the registration wave that arrives near registration's close.   Ward Tr., R.103, PageID#5304, 5309; Poland Tr., R.104, PageID#5357; Damschroder Tr., R.104, PageID#5451.   And they are preparing for Election Day by, among other things, "recruiting poll workers and training poll workers."   Damschroder Tr., R.104, PageID#5451-52.   All of this means that boards are working "overtime." Poland Tr., R.104, PageID#5358-59; Ward Tr., R.103, PageID#5307.

*Fraud Potential & Public Confidence*.   Ohio must balance early-voting options with the risks of fraud—and decreased public confidence—they create. The bipartisan OAEO recommended shortening early voting because overlapping registration and voting raises some fraud risk.   Ward Tr., R.103, PageID#5329; Damschroder Tr., R.104, PageID#5448, 5455; Poland Tr., R.104, PageID#5362. In Hamilton County, for example, two voters who registered and voted on the same day were suspected of voting fraudulently, and the cases were referred to the prosecutor.   Poland Tr., R.104, PageID#5360-61.   In Franklin County, some ballots cast during the overlapping period listed vacant residences.   Damschroder Tr., R.104, PageID#5450.   The State has an interest "in counting only the votes of eligible voters."   *Crawford*, 553 U.S. at 196 (Stevens, J., op.).

To be sure, Ohio strives to implement controls to make fraud as rare as possible, but even a few cases can threaten Ohio's interest in safeguarding public confidence by giving a general appearance that fraud is common. *Id.* at 197. It has an interest in safeguarding that public confidence, *id.* at 197, by eliminating even *appearances* of fraud. *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1671-72 (2015) (judicial speech bans survive strict scrutiny because of *appearance* of impropriety). Whatever fraud potential that absentee voting created is magnified by the public perception that reported cases from the registration period are the tip of an iceberg. The Early-Voting Law addressed this fraud-perception problem.

*Information Asymmetry.* Ohio must balance giving voters early-voting options against ensuring they have relevant information. "As you get further and further away from election day, you increase the chances that some sort of game-changing piece of news will occur." Trende Tr., R.103, PageID#5143. Yet the ability to vote "further away from election day" increases the chances that voters will lack that information. *Id.* The report discussed in *Crawford* acknowledged this concern. *Crawford*, 553 U.S. at 193-94; Report of the Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections* at 35-36 (Sept. 2005), *available at* http://www.eac.gov/assets/1/AssetManager/Exhibit%20M.PDF. Under the district court's schedule, for example, two of the three presidential debates would occur after some voters voted.

http://www.debates.org/index.php?page=2016debates (June 14, 2016). As the most extreme example, "[d]uring the past twenty years, two United States Senate candidates in competitive races have died in plane crashes close to Election Day." Trende Rep., R.127-14, PageID#6616.

*Costs*. Ohio must balance the marginal benefits of more days (in terms of more turnout) with their marginal costs (in terms of more personnel). In Hamilton County, for example, it cost between $16,000 and $24,000 to have a week of same-day registration and voting. Poland Tr., R.104, PageID#5378. In Cuyahoga County, it cost roughly $41,000. Perlotti Tr., R.97, PageID#4019. For smaller counties, it ran "a few thousand dollars." Munroe Tr., R.102, PageID#4942. Ohio could reasonably conclude that cost savings justified minor adjustments when "the bulk [of] the academic literature doesn't" even suggest that more hours generate more turnout. Hood Tr., R.99, PageID#4479; *N.C. State Conference of the NAACP v. McCrory*, 2016 WL 1650774, at *47 (M.D.N.C. Apr. 25, 2016).

*Confusion*. Finally, Ohio must balance early-voting options with clarity for voters. Overlapping registration and voting can mislead some voters into thinking that it exists for the entire absentee-voting window. Munroe Tr., R.102, PageID#4944. One official noted that some voters, upon hearing that they could register and vote together, showed up well after registration's close and expected to

be able to do so.  Damschroder Tr., R.104, PageID#5456.  "[T]here's a value to having clear" and simple rules: register first, vote later.  *Id.*

In short, Ohio must balance competing concerns.  Reasonable people could disagree on whether it should add an extra day here or drop an extra one there, but "[t]he role of this court is not to impose [its] own idea of democracy upon the Ohio state legislature." *Libertarian Party*, 462 F.3d at 587.

### 2.    The Early-Voting Law lacks discriminatory intent

While Ohio's early-voting options do not burden voting rights, that does not relieve the Early-Voting Law of constitutional scrutiny.  Any voting law, no matter how minor, would violate equal protection if its changes disparately affected African Americans and arose from a discriminatory intent.  *Blewett*, 746 F.3d at 658.  But the Democratic Parties "failed to show a discriminatory purpose."  Op., R.117, PageID#6237; *Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013).

### C.    The District Court's Contrary Analysis Was Mistaken

The district court suggested that only this Court could depart from *NAACP*. Not so.  *NAACP* became moot after a Supreme Court stay; it arose in a non-binding posture, and its vacatur deprived it "of precedential effect." *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975).  Its analysis was also mistaken.

### 1.   The district court mistakenly measured burdens

To justify greater scrutiny, the district court held that the Early-Voting Law's changes imposed modest burdens on some voters, and ignored *McDonald* and other state laws.  Op., R.117, PageID#6157-70.  That was wrong at every turn.

*All or Some Voters?*   The court facially invalidated Ohio law based on disparate impacts on a *subset of voters*.  Yet facial challenges require courts to measure burdens on *voters as a whole*.  In *Crawford*, six Justices agreed that the facial challenge could not proceed by examining "a small number of voters who may experience a special burden."  *Crawford*, 553 U.S. at 200 (Stevens, J., op.); *id.* at 205 (Scalia, J., concurring in judgment).  Instead, the Court considered "only the statute's broad application to all" voters.  *Id.* at 202-03 (Stevens, J., op.); *cf. Lawrence*, 430 F.3d at 373-74 (refusing heightened scrutiny based on burdens on independents).  The district court was particularly mistaken to rely on alleged *racial* disparate impacts.  That treats the *implicit* "right to vote" as requiring greater scrutiny of neutral laws than the *explicit* amendments addressing race—the Equal Protection Clause and Fifteenth Amendment.  The latter permit courts to invalidate neutral laws *only if* they were passed with discriminatory intent.  The district court read this requirement out of the Constitution.

*Voting System or Changes?*   The district court measured the wrong thing: the burdens from the Early-Voting Law's *changes* rather than from Ohio's *voting*

*system*.  When measuring a burden, courts do not analyze a change *in a vacuum*.  *Burdick*, 504 U.S. at 436-37.  Thus, the question here is not whether a *change* from a 35-day period to a 29-day period disparately affects African Americans; it is whether a start to voting 29 days before an election (rather than on Election Day itself) does so.  Yet, in 2014, African Americans and whites registered and voted at the *statistically same* rates.  Hood Tr., R.99, PageID#4390; Hood Rebuttal, R.127-18, PageID#7366-67; *cf.* Timberlake Tr., R.100, PageID#4559.  Ohio's current system has *no* disparate impact.

　　　　*Substantial or Modest Burdens?*  The district court described the Early-Voting Law's burdens as "modest."  Op., R.117, PageID#6156-57.  "If a statute imposes only *modest* burdens, however, 'the State's important regulatory interests are generally sufficient'" to uphold the law.  *Wash. State Grange*, 552 U.S. at 452 (citation omitted; emphasis added).  This is "akin to *rational-basis review*."  *Ohio Council*, 814 F.3d at 335 (emphasis added).  In this respect, the district court cannot rely on *NAACP* to justify higher scrutiny.  *NAACP* applied that scrutiny *only* because the district court found, on a preliminary record, that the challenged laws might "significantly burden[]" voting.  768 F.3d at 542.  To find a modest burden, moreover, the district court relied on, among other things, "anecdotal evidence" that some voters "are distrustful of voting by mail."  Op., R.117,

PageID#6165-66.  That was error.  *Weber v. Shelley*, 347 F.3d 1101, 1106-07 (9th Cir. 2003) (rejecting concerns of those who distrust touchscreen voting).

*Anderson-Burdick or McDonald?*  The district court did not cite *McDonald*. It perhaps relied on *NAACP*'s reasoning to distinguish it:  *McDonald* was "decided before the development of the *Anderson-Burdick* test."  768 F.3d at 541.  That is factually mistaken and legally irrelevant.  Factually, the *Anderson-Burdick* test dates to *Harper*, a case that *McDonald* cited.  *Burdick* also cited *McDonald* next to *Anderson*.  504 U.S. at 434.  Legally, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls."  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  And *Anderson-Burdick* and *McDonald* are compatible.  A standard akin to *rational-basis review* applies—under *Anderson-Burdick*—for minimal burdens.  *Ohio Council*, 814 F.3d at 338.  *McDonald* holds that absentee-voting bans impose minimal burdens, triggering that rational-basis review.

*Comparison or Isolation?*  The district court called Ohio's early-voting leadership irrelevant.  Op., R.117, PageID#6155.  But *Libertarian Party* invalidated laws only *after* finding them burdensome as compared to other state laws.  462 F.3d at 589-90.  And *Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir. 2015), noted that, as compared to other state laws, "only Tennessee's

34

access-retention system forces minor political parties to attain the *same* vote percentage as major political parties in *less* time." *Id.* at 695. If it is relevant that a State has some of the most restrictive laws in the country, it is relevant that the State has some of the most generous. "[T]he validity of a doctrine does not depend on whose ox it gores." *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 525 (1953) (Jackson, J., dissenting). More generally, Justices with as divergent views as Justices Scalia and Brennan could agree that a continuing tradition is at least "*relevant*" to the Fourteenth Amendment. *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 633 (1990) (Brennan, J., concurring in judgment). The district court should have given *some* weight to the fact that its holding voids the way that this Nation has traditionally voted and the way that most States continue to vote today.

### 2.    The district court wrongly downplayed Ohio's interests

The district court misjudged Ohio's interests. Generally, it wrongly subjected those interests to strict scrutiny in all but name, repeatedly criticizing the State for presenting "insufficient" evidence. Op., R.117, PageID#6174. Under even middle scrutiny, however, the Supreme Court does not assess "the sufficiency of the 'evidence.'" *Munro*, 479 U.S. at 195. The State need *not* present "elaborate, empirical verification." *Timmons*, 520 U.S. at 364. Even under strict scrutiny, the Court has upheld election regulations without "proof by documentary record." *Williams-Yulee*, 135 S. Ct. at 1667. Under middle scrutiny, by comparison, a state

interest need only be "reasonable." *Munro*, 479 U.S. at 195-96. This general error is shown by the court's specific analyses.

*First*, the district court ignored Ohio's interest in "reduc[ing] the risk that early voters will lack pertinent, late-breaking information." Ohio Br., R.110, PageID#5905. An expert testified about this interest, Trende Tr., R.103, PageID#5143, and discussed it in his report, Trende Rep., R.103, PageID#6616-18. It justifies reducing Ohio's elongated schedule.

*Second*, the district court mistakenly analyzed Ohio's fraud-related concerns. It discounted Ohio's interest in decreasing the potential for fraud because the record showed "very limited evidence of actual *occurrences*." Op., R.117, PageID#6174. Yet the Supreme Court upheld a *more* burdensome law in a case in which "the record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history." *Crawford*, 553 U.S. at 194 (Stevens, J., op.).

The district court also noted that similar fraud risks exist under Ohio's current schedule: A voter could register on day 30 and vote on day 29 before the board would receive an "undeliverable" acknowledgement card for that voter. Op., R.117, PageID#6172-73. This logic suggests that Ohio should have reduced early voting *more* by accepting the OAEO's initial 21-day recommendation. Yet if "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging too *little* speech," *Williams-Yulee*, 135 S. Ct. at 1668, it

is even more counterintuitive to argue that a law violates an implicit right to vote by abridging too *little* early voting.  This argument also overlooks the *reason* for the longer calendar—bipartisan compromise.  Ward Tr., R.103, PageID#5318; Anthony Tr., R.96, PageID#3781.

The district court lastly suggested that this fraud risk would be better addressed by extending "'the registration deadline itself to beyond 30 days before the election.'"  Op., R.117, PageID#6173 (citation omitted).  But federal law bars Ohio from having anything longer than a 30-day registration cutoff for federal elections.  52 U.S.C. § 10502(d).

*Third*, the district court found that Ohio failed to prove that its boards would be "unable to manage" the administrative burdens and costs.  Op., R.117, PageID#6176-77.  The question here is not whether boards absolutely needed the reduction to continue functioning (that would satisfy strict scrutiny); the question is whether these concerns were reasonable.  They were.  The court acknowledged that the boards were "extremely busy" at this time.  *Id.* PageID#6176.  Ohio need not wait until those burdens cause a drastic mistake before it can lighten their loads; it can respond "with foresight rather than reactively."  *Munro*, 479 U.S. at 195; *cf. Bennett v. Mollis,* 590 F. Supp. 2d 273, 277 (D.R.I. 2008) (ballot error led several voters to vote for withdrawn candidate).

37

*Fourth*, the district court brushed aside Ohio's interest in promoting public confidence and reducing voter confusion because of "insufficient evidence." Op., R.117, PageID#6178. Yet just as promoting public confidence has "independent significance" for photo-identification laws, *Crawford*, 553 U.S. at 197 (Stevens., J., op.), it has independent significance for Ohio's expansive schedule as well.

\* \* \*

When a State passes a law "beyond the requirements" of the Fourteenth Amendment, it is "later free to return" to the constitutional standard "prevailing generally throughout the United States." *Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 542 (1982). If, for example, Ohio protects gun rights more than the Second Amendment (as incorporated by the Fourteenth), the Fourteenth Amendment would not be found to cement those greater firearm protections. *Cf.* Ohio Rev. Code § 9.68. Or if Ohio protects religious freedom more than the First Amendment (as incorporated by the Fourteenth), the Fourteenth Amendment would not be found to cement those greater religious-liberty protections. *Cf. Humphrey v. Lane*, 728 N.E.2d 1039, 1045 (Ohio 2000). In the same way, the Fourteenth Amendment should not cement Ohio's expansive voting laws simply because Ohio has gone further than most States in promoting voting.

The district court was thus wrong to use an old-to-new comparison to constitutionalize Ohio's 2005 law. The Fourteenth Amendment should *always*

require such a "one-way ratchet" or it should *never* require it; courts should not make value judgments about which protected rights are worthy of a constitutional "retrogression" rule.  Far better that they categorically reject that rule.  It would discourage States from undertaking their "'long recognized'" role of "'devising solutions'" to our country's problems if they could not modify new ideas through trial and error. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015) (citation omitted).    The Michigan House of Representatives, for example, recently passed a bill that would permit no-excuse absentee balloting.  H.B. No. 4724 (Dec. 9, 2015).  Michigan should question whether that bill makes sense if this Court holds that any expansion must remain forever.    Instead, the Court should reaffirm that States are "laboratories of democracy" that may experiment with new policies without losing the right to govern themselves in the process.

## II.    SECTION 2 OF THE VOTING RIGHTS ACT DOES NOT REQUIRE STATES TO OFFER 35 DAYS OF ABSENTEE VOTING

Section 2 bars voting practices that result in the denial or abridgment of the right to vote because of race.  The Early-Voting Law lacks such a result.

### A.    Section 2 Requires A Plaintiff To Identify An Alternative To A Challenged Practice And To Prove That The Practice Has Caused The State's Political Processes To Be Unequally Open

In 1965, Section 2 mirrored the Fifteenth Amendment by prohibiting only *intentional* discrimination.  *Mobile v. Bolden*, 446 U.S. 55, 60-61 (1980) (plurality

op.).  In 1982, Congress amended Section 2 by adding a "results" test to subsection

(a) and explaining the nature of that test in a new subsection (b):

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, . . . , as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301; *Thornburg v. Gingles*, 478 U.S. 30, 84 (1986) (O'Connor, J.,

concurring in judgment).  This text "grew out of a fierce political fight and bears

the marks of compromise."  *Baird v. Consol. City of Indianapolis*, 976 F.2d 357,

359 (7th Cir. 1992).  It retained "intentional discrimination under § 2(a) [as] an

option," while adding the new Section 2(b) to cover unequally open political

processes.  *Id.* at 359-60.

    In "vote-dilution" cases involving legislative-district drawing, the Supreme

Court has interpreted this text to have three elements.  Element One:  "[A] court

must find a reasonable alternative practice as a benchmark against which to

measure the [challenged] voting practice." *Holder*, 512 U.S. at 880 (Kennedy, J., op.). Element Two: The court must decide whether the three so-called "*Gingles* preconditions are met," an inquiry designed to show a causal connection between the challenged practice and the unequally open political processes. *Id.* Element Three: The court considers "the totality of the circumstances." *Id.* Because Section 2's text is the same for any claim, these elements offer guidance here.

### 1. Challengers must identify an objective benchmark with which to compare a challenged practice

To decide whether a "practice" abridges voting on account of race, a court must compare its effect on a racial group to the effect on that group of an *alternative* practice. "It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) (*Bossier II*). Instead, "a comparison must be made between the status quo and a hypothetical alternative." *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 366 (6th Cir. 2002). One must compare the right to vote under the current practice "relative to what the right to vote *ought to be*." *Bossier II*, 528 U.S. at 334; *Gingles*, 478 U.S. at 88 (O'Connor, J., concurring in judgment) (asking "how hard it 'should' be" "under an acceptable system"). Several guideposts exist for picking the benchmark.

*First*, in many cases a benchmark may be "obvious." *Holder*, 512 U.S. at 880 (Kennedy, J., op.). When a voting qualification—such as a literacy test or a

poll tax—disqualifies voters who fail to meet it, the comparator (or "benchmark") will be a regime *without* that requirement. *Id.* at 880-81.

*Second*, background principles are relevant. *Hayden v. Pataki*, 449 F.3d 305, 315-16 (2d Cir. 2006) (en banc); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1234 (11th Cir. 2005) (en banc). Two examples illustrate the point. Citizens do not have a constitutional "right to vote" for local administrative officers. *Moore*, 293 F.3d at 365-66. This Court thus rejected a Section 2 claim against a law changing a school board from elected to appointed. *Id.* While the challengers complained about the law, "they ha[d] no authority for their implied conclusion that they *ought to have* the right to elect members of the" board. *Id.* at 366. Similarly, felons lack a constitutional "right to vote." *Johnson*, 405 F.3d at 1234-35. So felon-disenfranchisement laws fall outside Section 2, even if they have disparate impacts as compared to a voting regime *without* those limitations. *Hayden*, 449 F.3d at 322.

*Third*, the Supreme Court has identified what the benchmark *cannot* be: prior law. The Act reserves *old-to-new* comparisons for Section 5, which required certain States to obtain preclearance for voting changes. Under Section 5, "[t]he baseline for comparison is present by definition; it is the existing status." *Holder*, 512 U.S. at 883 (Kennedy, J., op.). In contrast, "[r]etrogression is not the inquiry in § 2 dilution cases." *Id.* at 884.

42

*Fourth*, it may prove impossible to identify a "principled reason why one [hypothetical alternative] should be picked over another as the benchmark for comparison." *Id.* at 881. Where the choice is "'inherently standardless,'" the claim fails. *Id.* at 885 (citation omitted). In *Holder*, for example, challengers brought a vote-dilution claim against a county's choice to have *one* commissioner. They sought to compare that choice to a "hypothetical five-member commission." *Id.* at 881. That was arbitrary because "there [was] no objective and workable standard for choosing a reasonable benchmark." *Id.*

*Fifth*, close cases trigger traditional canons of interpretation, including the canon of constitutional avoidance, *Johnson*, 405 F.3d at 1229, or clear-statement rule, *Hayden*, 449 F.3d at 323. The former applies to the Voting Rights Act—which has been no stranger to constitutional litigation. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204-05 (2009). The latter applies when a federal law intrudes on state functions. *Sheriff v. Gillie*, 136 S. Ct. 1594, 1602 (2016).

### 2.    Challengers must prove a causal connection between unequal political processes and the challenged practice

Even if challengers can show that a practice has a racially disparate impact, "[i]t is well-settled . . . that a showing of disproportionate racial impact alone does not establish a *per se* violation." *Wesley v. Collins*, 791 F.2d 1255, 1260-61 (6th Cir. 1986); *Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Div.*, 28 F.3d 306, 312 (3d Cir. 1994). Challengers must prove that

the *specific* practice has caused a State's *entire* "political processes" to be "*[un]equally open*" for a racial group "'in that its members have *less opportunity* than other members of the electorate to participate in the political process.'" *Frank*, 768 F.3d at 753. This causation requirement "avoid[s] the serious constitutional questions that might arise" from a disparate-impact test alone. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 135 S. Ct. 2507, 2522 (2015). It requires two rigorous showings.

At a "macro" level, challengers must show that a State's political processes are "not equally open." The word "equally" is key. *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality op.). The statute does not require every "opportunity or mechanism through which minority voters could work with other constituencies to elect their candidate of choice." *Id.* "Failure to maximize" *one* group's participation "cannot be the measure of § 2" because that would treat *other* groups unequally. *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). Section 2 requires equal—not preferential—treatment. *Bartlett*, 556 U.S. at 20 (plurality op.).

This macro inquiry examines the "political processes"—e.g., the "entire voting and registration system." *Frank*, 768 F.3d at 753. "No state has exactly equal registration rates, exactly equal turnout rates, and so on, at every stage of its voting system." *Id.* Voters of some racial groups may use more of certain voting methods (such as Sunday voting); voters of other groups may use more of

alternative options (such as Election Day voting).  If, in the end, voters from all groups participate *equally*, it would make no sense to invalidate a particular option. To hold otherwise would "dismantle every state's voting apparatus."  *Id.*

At the "micro" level, challengers must connect those *general* inequalities to *specific* practices.  That is because Section 2 is "an equal-treatment requirement," not "an equal-outcome command."  *Frank*, 768 F.3d at 754.  Where factors other than the challenged practices cause the general disparity, a Section 2 claim fails. In *Irby v. Virginia State Board of Elections*, 889 F.2d 1352 (4th Cir. 1989), for example, plaintiffs challenged a school-board appointment process on the ground that African Americans were underrepresented.  *Id.* at 1358.  The court held that the appointment system did not cause the underrepresentation because it resulted from a socioeconomic factor:   African Americans were simply "'not seeking school board seats in numbers consistent with their percentage of the population.'" *Id.*; *cf. Frank*, 768 F.3d at 753; *Ortiz*, 28 F.3d at 316.

Vote-dilution cases in which a minority seeks a "majority-minority" district offer another example.  The *Gingles* "preconditions" establish causation in that context.  *Mallory v. Ohio*, 173 F.3d 377, 382 (6th Cir. 1999).  They require challengers to show that (1) the minority group "'is sufficiently large and geographically compact to constitute a majority in a single-member district'"; (2) the group is "'politically cohesive'"; and (3) the majority votes "'sufficiently as

45

a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Bartlett*, 556 U.S. at 11 (plurality op.) (citation omitted).  These factors determine whether the State's challenged line-drawing has "'proximately caused'" the electoral inequities. *Gingles*, 478 U.S. at 50 n.17 (citation omitted).  If a minority is geographically dispersed because of preexisting *socioeconomic factors*, those factors instead cause the dilution by making a majority-minority district impossible.  *Id.* at 50.  "[I]f the minority group cannot show that such a district could be formed, it follows logically that the [challenged law] is not the cause."  *Mallory*, 173 F.3d at 382.

### 3.    Challengers must establish liability under the "totality of the circumstances"

If challengers prove that a benchmark exists and that specific practices have caused the State's political processes to be unequally open, they must prove "that the totality of the circumstances supports" liability.  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) (*Bossier I*).  In vote-dilution cases, this test centers on the nine *Gingles* "factors" drawn from the Senate committee report.  *Frank*, 768 F.3d at 752.  Yet courts *never* reach those factors unless challengers meet the first two elements.  *Bartlett*, 556 U.S. at 11-12 (plurality op.).

**B.     The Democratic Parties Failed To Identify An Objective Benchmark Or Prove Causation**

Section 2 does not condemn the Early-Voting Law because the Democratic Parties failed to identify an objective benchmark or prove that the law has caused Ohio's political processes to be unequally open.

### 1.     The Democratic Parties offer no valid benchmark

The Democratic Parties cannot provide a proper benchmark with which to compare Ohio's calendar.

a. *Arbitrary Choice*.  The choice of a benchmark here is just as "'inherently standardless'" as was the choice in *Holder*.  512 U.S. at 885 (Kennedy, J., op.) (citation omitted).  Even assuming African Americans use early voting more than others, Ohio's expansive options *benefit* African Americans compared to most benchmarks.  A few examples illustrate the point.  Overall, Ohio's schedule would beat 41 other state schedules in terms of hours.  Trende Rep., R.127-14, PageID#6629.  Or should the comparison be with the *median* schedule?  Here, too, Ohio's is more expansive than those 14 days.  *Id.* PageID#6610.  Or perhaps it should be an intra-circuit matchup among the four States in this Circuit.  Ohio fares better than these other States as well.  *Id.* PageID#6612.

Nor can a particular plaintiff's preferred "schedule," such as "unlimited evenings and weekends," provide an *objective* alternative.  An "ever more" standard has no limiting principle.  Within a fixed timeframe of 28, 35, or any

days, it could be four or five Saturdays or Sundays, with evening hours up to midnight.  Or maybe 24/7?  In short, "it is one thing to say that a benchmark can be found, quite another to give a convincing reason for finding it in the first place." *Holder*, 512 U.S. at 882 (Kennedy, J., op.).  Ohio satisfies Section 2 under any *reasonable* benchmark.  Because the hypothetical choice is standardless, it cannot be made.

   b. *Historical Backdrop*.  If anything, background constitutional and historical principles identify only one objective benchmark:  Election Day voting.  Before Congress passed the 1982 amendment, the Supreme Court had already held that the "right to vote" did not include the "right to receive absentee ballots." *McDonald*, 394 U.S. at 807.  This case is thus on all fours with those relying on the constitutional meaning of the "right to vote" to interpret Section 2.  *E.g., Hayden*, 449 F.3d at 317.  An analogy to *Moore* is striking.  There, as here, challengers claimed that Section 2 gives them "the right to do something . . . that they never had a fundamental right to do."  293 F.3d at 365.  In *Moore*, it was a right to have an elected school board.  *Id.*  In this case, it is a right to vote absentee.  What *Moore* said there applies here:  "The [Democratic Parties] complain about the status quo imposed by the [Early-Voting Law], but they have no authority for their implied conclusion that they *ought to have* the right to [vote 35 days before an election]."  *Id.* at 366.

Situating Section 2 in history also confirms this benchmark. "[R]easonable statutory interpretation must account for . . . 'the broader context of the statute as a whole.'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (citation omitted). Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). In that respect, it is inconceivable that the Congress that amended Section 2 in 1982 intended to invalidate Ohio's 29-day voting schedule. Early in-person voting did not exist in any State for many years until Texas first adopted it in 1988. Stein, *supra*, at 183. Under the Democratic Parties' view that the benchmark exceeds Ohio's 29 days, Congress, by amending Section 2, immediately outlawed all 50 States' regimes. That view also has "far-reaching implications" for the States with fewer options today. *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1254 (M.D. Fla. 2012).

c. *Constitutional Avoidance*. If any doubt remains, the canon of constitutional avoidance resolves it for Ohio. This case would raise serious constitutional questions under the Democratic Parties' view. Section 2 arises from Congress's "power to enforce" the Fifteenth Amendment. U.S. Const. amend. XV, § 2. Under this provision, Congress may *both* prohibit violations of the Fifteenth Amendment (as with 42 U.S.C. § 1983), *and* "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721,

727-28 (2003). The scope of the latter power has limits. There must be "congruence and proportionality" between the harm remedied and the means employed. *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997). Proper legislation responds to a history of *actual* constitutional violations. *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 368 (2001).

Indeed, the Supreme Court has already said that Congress's power to enforce voting rights is limited to practices historically used for discrimination. *Oregon v. Mitchell,* 400 U.S. 112, 118 (1970), *superseded by* U.S. Const. amend. XXVI. *Oregon* affirmed a ban on literacy tests, because "Congress had before it a long history of discriminatory use of literacy tests to disenfranchise voters on account of their race." *Id.* at 132 (Black, J., op.). But it *voided* an attempt to lower the voting age to 18 for state elections, because Congress "made no legislative findings that the 21-year-old vote requirement was used by the States to disenfranchise voters on account of race." *Id.* at 130.

Accordingly, courts have interpreted Section 2 to avoid such questions. Courts that have excluded felon-disenfranchisement laws from Section 2, for example, have noted that a contrary reading "raises grave constitutional concerns." *Johnson*, 405 F.3d at 1232; *id.* at 1231 (noting "absence of congressional findings that felon disenfranchisement laws were used to discriminate"). At least with those laws, some evidence exists of their use for discriminatory purposes. *See Hunter*,

50

471 U.S. at 228-29.  Here, however, no evidence exists that States voted *only* on Election Day to discriminate.  Early in-person voting is a recent innovation designed to *encourage* voting.  *Cf. Frank*, 768 F.3d at 755 (noting that felon-disfranchisement cases "offer strong support for our reading of § 2").

d.  *Clear-Statement Rule*.  The clear-statement rule also resolves any doubt for Ohio.  "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."  *United States v. Bass*, 404 U.S. 336, 349 (1971).  State law has long governed elections, so when a "federal statute concerns congressional regulation of elections . . . a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power."  *Arizona v. Inter Tribal Council of Ariz., Inc.,* 133 S. Ct. 2247, 2261 (2013) (Kennedy, J., concurring in part and concurring in judgment).  To be sure, the Court has not applied this "clear-statement rule" for legislation under the *Elections Clause*, which allows Congress to regulate federal elections.  U.S Const., Art. I, § 4, cl. 1; *Inter Tribal*, 133 S. Ct. at 2256-57.  But the Voting Rights Act is *not* Elections Clause legislation (it applies to state elections), so it leaves courts with the usual "presumption that Congress does not intend to supplant state law."  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654 (1995).

"The historic accomplishments of the Voting Rights Act are undeniable":  it significantly changed the federal-state balance and for good reason given the "rampant" discrimination at the time.  *Nw. Austin*, 557 U.S. at 201.  But Congress, through Section 2, did not convey the required clear statement to micromanage Ohio's generous early-voting calendar.  Indeed, Section 2 governs how States choose their representatives, and the Supreme Court has acknowledged the "unique nature of state decisions that 'go to the heart of representative government.'" *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (citation omitted).

Finally, Congress, through *other* legislation, conveyed the *opposite* intent. Using its Elections Clause authority, Congress has long told the States to have *one* Election Day.  2 U.S.C. §§ 1, 7 (senators and representatives); 3 U.S.C. § 1 (president).  If Congress instead wanted States to enact 35 additional election days, it would say so.  Additionally, the National Voter Registration Act blessed state registration *deadlines* 30 days before Election Day.  52 U.S.C. § 20507(a). Accordingly, the clear-statement rule also requires this Court to resolve any doubt about Section 2 for Ohio.

### 2.  The Democratic Parties did not prove that the Early-Voting Law caused Ohio's political processes to be unequally open

The Democratic Parties did not prove that the Early-Voting Law *caused* Ohio's political processes to be unequally open to African Americans.  If anything, at the *macro* level, statistical evidence shows that African-American registration

and voting have outpaced white registration and voting in recent years. For registration, African Americans registered at higher percentages than whites in 2008, 2010, 2012, and 2014. Hood Rebuttal, R.127-18, PageID#7366. At worst, the registration numbers are "statistically indistinguishable" for every federal election from 2006 through 2014. *Id*. For turnout, the rates of casting votes are "statistically" the same for 2008, 2010, and 2014. *Id*. at 7367. Indeed, in 2012, African-American turnout exceeded white turnout by a "statistically distinguishable" amount of nearly 10%. *Id*.

These statistics, notably, originate with the same source that the Seventh Circuit used to reverse an injunction against Wisconsin's photo-identification law. *Frank*, 768 F.3d at 753. In so doing, the court explained that such outcome statistics are "essential" when a challengers' claim, like here, rests on allegations of a law's disparate impact, rather than its discriminatory intent. *Id*. at 754.

The Democratic Parties, moreover, offered nothing to rebut this statistical proof that Ohio's "political processes" are "equally open" to African Americans. 50 U.S.C. § 10301(b). Their expert conducted no "analysis linking" social or economic disparities between racial groups to differing rates of "voter participation," Timberlake Tr., R.100, PageID#4559; indeed, he did not view registration and voting statistics "as a particularly kind of useful way" to determine whether Ohio's political processes are equally open, *id*. PageID#4562. That was

legal error.  Courts—not sociologists—decide what Section 2 means.  *Frank*, 768 F.3d at 754.  Without that macro showing, the Democratic Parties' claim fails.

Instead, the Democratic Parties remained only at the *micro* level, but their extrapolations that African Americans used the eliminated voting week more than whites do not suffice.  Op., R.117, PageID#6159.  The possible disparities as to a tiny *subset* of Ohio's many voting options do not establish a Section 2 claim— which asks whether the State's political processes "as a whole" are unequally open. *Frank*, 768 F.3d at 753.  Whites may use Election Day voting at higher rates than African Americans; African Americans may vote early at higher rates than whites. But neither disparity matters unless it *causes* disparity in overall "participat[ion]." 52 U.S.C. § 10301(b).  Further, statistics showed that voters who had used the eliminated week in 2010 were just as likely to vote in 2014 as voters who had voted at other times in 2010.  McCarty Tr., R.98, PageID#4141-42.

If anything, Ohio's current voting calendar already accommodates African-American preferences more than other state calendars.  Ohio's 2016 calendar includes voting on *two* Sundays.  Calendar, R.127-14, PageID#6769-70.  The second Sunday resulted from a settlement with the NAACP (which retained the elimination of the initial voting week).  Settlement, R.127-14, PageID#6775.  One witness suggested that Sunday voting is "very important" to African Americans. Turner Tr., R.96, PageID#3601.  Get-out-the-vote efforts such as Souls to the Polls

aim to transport predominately African American "congregations from the church to the voting place."  Butcher Tr., R.96, PageID#3646-47; Perlatti Tr., R.96, PageID#4029.  Yet Ohio is one of only 13 States that offers any Sunday voting—and it offers two days of it.  Trende Rep., R.127-14, PageID#6615.  Ohio's voting calendar is not unequally open.

### C.    The District Court Incorrectly Interpreted Section 2

To find a violation of Section 2, the district court again followed the non-precedential *NAACP* decision over binding precedent.  That was again error.

#### 1.    The district court wrongly compared Ohio's current law to its old law (rather than a hypothetical benchmark) to find a racially disparate harm

The district court erred *both* by saying that it need not identify an objective benchmark *and* by using Ohio's past schedule as that benchmark anyway.

To begin with, the court said it "need not identify an objective benchmark" because "the relevant benchmark is inherently built into § 2 claims and is whether members of the minority have less opportunity than other members of the electorate to" participate in the political processes.  Op., R.117, PageID#6219 (citing *NAACP*, 768 F.3d at 556).  But *every* case that explains how Section 2 "entails a comparison," *Bossier II*, 528 U.S. at 334, has meant a comparison "between the [current practice] and a hypothetical alternative," *Moore*, 293 F.3d at 366, not a comparison between one racial group and another.  *Cf. Holder*, 512 U.S.

at 887 (O'Connor, J., concurring in judgment) (noting "general agreement" among all Justices that "courts must choose an objectively reasonable alternative practice as a benchmark for the dilution comparison").

*NAACP* distinguished these many cases as involving vote dilution. 768 F.3d at 556. But this Court has already extended them. In *Moore*, in a non-dilution context, plaintiffs suggested that the switch to an appointed school board had led to the "complete denial" of their right to vote, and the Court compared that system to a hypothetical alternative. 293 F.3d at 365-66. Nor does any vote-dilution limit make sense. All of these cases "derive from the same statutory text," *McCrory*, 2016 WL 1650774, at *150 n.228, and the *text* mandates the comparison: "It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare" it. *Bossier II*, 528 U.S. at 334.

Regardless, the district court did not even undertake the very comparison between racial groups that it (and *NAACP*) suggested: "[H]ow do minorities fare in their ability 'to participate in the political process' *as compared to other groups of voters*?" 768 F.3d at 556. Perfectly well. As noted, African Americans registered and voted at the same rates as others. Hood Rebuttal, R.127-18, PageID#7366-67. Ohio wins even under *NAACP*'s mistaken logic.

Instead, to find a disparate impact, the district court used retrogression: It said that the Early-Voting Law's *changes* from the old schedule to the new one

disparately affected African Americans because they used the reduced options more. Op., R.117, PageID#6220. But Section 2 does *not* bar such retrogression. That is Section 5's domain. The Supreme Court has consistently "refuse[d] to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003). "The inquiries under §§ 2 and 5 are different." *Bartlett*, 556 U.S. at 24 (plurality op.). The "*more stringent*" Section 5 "asks whether a *change* has the purpose or effect of" infringing minority rights. *Id.* at 25 (emphases added). The district court thus read Section 2 as incorporating intrusive retrogression rules for *all 50* States just three years after the Supreme Court struck down that intrusive inquiry only for *certain covered* States. *Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013).

The district court insisted that it was not "graft[ing] a retrogression analysis" onto Section 2 because it was comparing the new law to the old law as part of "the 'totality of the circumstances.'" Op., R.117, PageID#6219. Yet in word and deed, retrogression is exactly what it did. It evaluated whether Ohio's new law "'eliminates voting opportunities that used to exist.'" Op., R.117, PageID#6220 (citation omitted). And its remedy (perhaps unsurprisingly) reinstated Ohio's *old* schedule. *Id.* PageID#6242. Its immediate jump to the "totalities," moreover, departed from the Supreme Court's multi-step approach. In the dilution context, the Court has said that identifying the benchmark and proving causation through

the *Gingles* preconditions *precede* the totalities. "[O]nly when a party has established the *Gingles* [preconditions] does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett*, 556 U.S. at 11-12 (plurality op.). Without the initial baseline, "there neither has been a wrong nor can be a remedy." *Growe v. Emison*, 507 U.S. 25, 41 (1993). Indeed, the Supreme Court has criticized a district court for doing precisely what the district court did here—"proceed[ing] directly to the 'totality of circumstances' test" without satisfying the initial elements first. *Id.* at 38.

In sum, the district court said that it need not identify a benchmark but then relied entirely on the one benchmark it could not use: Ohio's old law.

### 2. The district court's immediate jump to the *Gingles* factors ignored the statutory command to consider whether the Early-Voting Law *caused* unequal political processes

After finding that the Early-Voting Law had retrogressive effect, the district court immediately jumped to the *Gingles* factors. Op., R.117, PageID#6220. That, too, was error. Those factors enter the picture only *after* a court concludes that a challenger has established causation; they do not replace that element. *Growe*, 507 U.S. at 41. Accordingly, the court *nowhere* even discussed whether the Early-Voting Act had *caused* African-American voters to turnout less. In that respect, it did not mention, let alone dispute, the macro-level data illustrating that African Americans and whites *equally* participate in Ohio's political processes. Hood

Rebuttal, R.127-18, PageID#7366-67.  And it did not dispute the data showing that all voters who used the eliminated week in 2010, *whatever their race*, were just as likely to vote in 2014 as those voters who had voted at other times in 2010. McCarty Tr., R.98, PageID#4141-42; *cf.* Op. R.117, PageID#6167 (questioning *only* method of predicting the race of early voters).

The court's injunction thus conflicts with governing legal principles. Because Ohio's calendar has caused no disparate voting at the macro level, the injunction requires Ohio to offer *more* opportunity for African Americans to participate in an *equal* process.  But that emphasizes the word "'opportunity' at the expense of the word 'equally.'"  *Bartlett*, 556 U.S. at 20 (Kennedy, J., op.). "Section 2 does not guarantee minority voters an electoral advantage."  *Id.*; *Johnson*, 512 U.S. at 1017 ("Failure to maximize cannot be the measure of § 2."). Ohio's current laws are "equally open" because African Americans and whites register to vote and vote in equal percentages.  Section 2 mandates nothing more. The district court thus should not have slogged through the *Gingles* factors.

When doing so, however, the district court again erred.  Even at the totality-of-the-circumstances stage, those factors are "unhelpful in voter-qualification cases."  *Frank*, 768 F.3d at 754.  Even if they were, the district court did little to connect them to any disparate burdens caused by the Early-Voting Law.  It relied primarily on factor five, indicating that socioeconomic disparities might cause

difficulties for some African Americans in getting to the polls.  Op., R.117, PageID#6228-29.  Yet if those *socioeconomic disparities* caused (non-existent) disparate outcomes, it cannot be said that the *Early-Voting Law* did so.  *Cf. Ortiz*, 28 F.3d at 312 (noting that "[t]he societal disadvantages cited by the plaintiffs and the dissent just are not relevant").  Socioeconomic conditions might likewise make it impossible for a minority to form a majority-minority district, but this Court has said that *proves* that the State's districting scheme did *not* cause any vote dilution. *Mallory*, 173 F.3d at 382.  Section 2 "does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters."  *Frank*, 768 F.3d at 753.  It requires only that States provide equal opportunities; Ohio's schedule (with its proved results) has done so.

The district court compounded its errors by claiming that the "totality" of the circumstances actually omits a circumstance—other state practices.  Op., R.117, PageID#6219.  The "totality of the circumstances" would obviously include those practices.  *Frank*, 768 F.3d at 753 (citing "[e]xperience from other states").  And an interpretation of Section 2 that would "dismantle every state's voting apparatus" is likely incorrect.  *Id.* at 754; *cf. Bossier II*, 528 U.S. at 330-31.  Indeed, a constitutional problem arises from viewing Ohio as an island: It treats States disparately.  Ohio is a target only because it previously offered more voting opportunity.  Other States that never expanded voting in the same way are not

targets.  Interpreting Section 2 to disparately treat States in this way hardly respects

their equal "'dignity.'"  *Shelby Cnty.*, 133 S. Ct. at 2623 (citation omitted).

## CONCLUSION

The Court should reverse the district court.


Respectfully submitted,

MICHAEL DEWINE
Ohio Attorney General

*/s/ Eric E. Murphy*
ERIC E. MURPHY* (0083284)
State Solicitor
  *Counsel of Record*
MICHAEL J. HENDERSHOT (0081842)
Chief Deputy Solicitor
STEPHEN P. CARNEY (0063460)
Deputy Solicitor
STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980; 614-466-5087 fax
eric.murphy@ohioattorneygeneral.gov

Counsel for Appellants Ohio Secretary of
State Jon Husted and Ohio Attorney General
Michael DeWine

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies

with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B):

1.  Exclusive of the portions of the brief exempted by 6th Cir. R. 32 (b)(1), the brief contains 13,981 words.

2.  The brief has been prepared in monospaced (nonproportionally spaced) typeface using a Times New Roman, 14 point font.

*/s/ Eric E. Murphy*
ERIC E. MURPHY (0083284)
State Solicitor

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served through the Court's electronic filing system on this 24th day of June 2016. Electronic service was therefore made upon all counsel of record on the same day.


*/s/ Eric E. Murphy*
ERIC E. MURPHY (0083284)
State Solicitor

## DESIGNATION OF DISTRICT COURT RECORD

Defendants-Appellants Ohio Attorney General Michael DeWine and Ohio

Secretary of State Jon Husted designate the following district court documents:

| Doc. No. | Name of Document and Date | PageID# |
|----------|---------------------------|---------|
| 1 | Complaint | 1-62 |
| 96 | Trial Transcript, Volume I | 3540-3799 |
| 97 | Trial Transcript, Volume II | 3800-4075 |
| 98 | Trial Transcript, Volume III | 4076-4304 |
| 99 | Trial Transcript, Volume IV | 4305-4488 |
| 100 | Trial Transcript, Volume V | 4489-4693 |
| 102 | Trial Transcript, Volume VII | 4847-5076 |
| 103 | Trial Transcript, Volume VIII | 5077-5343 |
| 104 | Trial Transcript, Volume IX | 5344-5530 |
| 110 | Defendants' Proposed Findings of Fact and Conclusions of Law | 5856-5927 |
| 115 | Opinion and Order | 6078-6103 |
| 117 | Findings of Fact and Conclusions of Law | 6123-6242 |
| 118 | Judgment | 6243 |
| 119 | Notice of Appeal | 6244-6245 |
| 125 | Stay Order | 6300-6308 |
| 127-8 | ODP Responses to Interrogatories | 6461-6492 |

| Doc. No. | Name of Document and Date | PageID# |
|---|---|---|
| 127-14 | Declaration of Sean P. Trende | 6601-7254 |
| 127-15 | Declaration of M.V. Hood III | 7255-7311 |
| 127-18 | Rebuttal Declaration of M.V. Hood III | 7364-7392 |