No. 16-3561

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| OHIO DEMOCRATIC PARTY; DEMOCRATIC PARTY OF CUYAHOGA COUNTY; MONTGOMERY COUNTY DEMOCRATIC PARTY; JORDAN ISERN; CAROL BIEHLE; BRUCE BUTCHER, <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> JON HUSTED, IN HIS OFFICIAL CAPACITY, AS SECRETARY OF STATE OF THE STATE OF OHIO; MIKE DEWINE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF OHIO, <br><br> Defendants-Appellants. | On Appeal from the United States District Court for the Southern District of Ohio Eastern Division <br><br><br> *District Court Case No. 2:15-cv-1802* |

**PLAINTIFFS-APPELLEES' BRIEF**

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Rhett P. Martin
Amanda R. Callais
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

Joshua L. Kaul
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, WI 53703
Telephone: 608. 294.4007
Facsimile: 608. 663.7499

Donald J. McTigue
J. Corey Colombo
Derek S. Clinger
McTigue & Colombo LLC
545 East Town Street
Columbus, OH 43215
Telephone: 614.263.7000
Facsimile: 614.263.7078

*Attorneys for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: <u>16-3561</u>          Case Name: <u>Ohio Democratic Party, et al. v. Husted</u>

Name of counsel: <u>Marc E. Elias</u>

Pursuant to 6th Cir. R. 26.1, <u>Ohio Democratic Party</u>
<p align="center"><i>Name of Party</i></p>
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

<div style="border:1px solid black;padding:10px;">

<p align="center">CERTIFICATE OF SERVICE</p>

I certify that on <u>      July 11, 2016      </u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

<u>s/ Marc E. Elias</u>

</div>

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 16-3561 _____    Case Name: Ohio Democratic Party, et al. v. Husted

Name of counsel: Marc E. Elias _____

Pursuant to 6th Cir. R. 26.1, Democratic Party of Cuyahoga County _____
                                                  *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ July 11, 2016 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Marc E. Elias _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 16-3561            Case Name: Ohio Democratic Party, et al. v. Husted

Name of counsel: Marc E. Elias

Pursuant to 6th Cir. R. 26.1, Montgomery County Democratic Party
                                          *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 11, 2016 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Marc E. Elias

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 16-3561                    Case Name: Ohio Democratic Party, et al. v. Husted

Name of counsel: Marc E. Elias

Pursuant to 6th Cir. R. 26.1, Bruce Butcher
                                   *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 11, 2016 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Marc E. Elias

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**. With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement. A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal. A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**. The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 16-3561          Case Name: Ohio Democratic Party, et al. v. Husted

Name of counsel: Marc E. Elias

Pursuant to 6th Cir. R. 26.1, Jordan Isern
                                    *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 11, 2016 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Marc E. Elias

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 16-3561              Case Name: Ohio Democratic Party, et al. v. Husted

Name of counsel: Marc E. Elias

Pursuant to 6th Cir. R. 26.1, Carol Biehle
                                *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 11, 2016 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Marc E. Elias

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................vi

INTRODUCTION ..........................................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE AND FACTS ................................................2

    A.   Ohio's History of Racial Discrimination and Its Ongoing Effects ..................................................................2

    B.   Ohio's Troubled Election History and Attempted Reforms ..................................................................5

    C.   The Challenged Provisions ...................................................7

    D.   Use of EIP Voting and SDR ...................................................8

    E.   History of Court Challenges And Procedural History.............11

SUMMARY OF THE ARGUMENT ....................................................13

STANDARD OF REVIEW ..............................................................15

ARGUMENT ..............................................................................16

I.    OHIO'S ELIMINATION OF GOLDEN WEEK VIOLATED THE VRA ...............................................................................16

    A.   Legal Standard ...................................................................16

    B.   The District Court Correctly Found a Violation of Section 2 ..........................................................................19

    C.   The State's Arguments Are Without Merit............................24

II.   OHIO'S ELIMINATION OF GOLDEN WEEK VIOLATES THE FOURTEENTH AMENDMENT .............................................35

    A.   Legal Standard ...................................................................35

    B.   The Elimination of Golden Week Burdens Ohioans' Voting Rights ..................................................................36

## TABLE OF CONTENTS
### (continued)

**Page**

C.     The State Has Failed to Justify The Burdens Imposed On Voters By the Elimination of Golden Week ............................ 42

      1.     The district court's conclusion that SB238 does not materially further state interests was amply justified by its findings of fact ....................................... 42

      2.     The state's arguments for rational basis fail ................. 50

CONCLUSION ...................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................ 35, 53

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006) ..................................... 5

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................... 35, 43, 55, 56

*Bush v. Vera*, 517 U.S. 952 (1996) .............................................................................. 33

*Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244 (6th Cir. 2015) ....................... 15

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................ 16, 28, 33, 34

*Common Cause Ind. v. Individual Members of the Ind. Election Commission*, 800 F.3d
    913 (7th Cir. 2015) ................................................................................................ 43, 56

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ................................ passim

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) .................................................... 27, 28

*Frank v.* Walker, 773 F.3d 783 (2014) ....................................................................... 27

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) .................................................................. 31

*Harkless v. Husted*, No. 1:06-cv-02284, 2011 WL 2149179 (N.D. Ohio Mar. 31, 2011) ............. 5

*Holder v. Hall*, 512 U.S. 874 (1994) .......................................................................... 30

*Husted v. Ohio State Conference of NAACP*, 135 S. Ct. 42 (Sept. 29, 2014) .............. 12

*Irby v. Va. State Bd. of Elections*, 889 F.2d 1352 (4th Cir 1989) ................................. 25

*League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224 (4th Cir. 2014) .................. passim

*McDonald v. Bd. of Election Commissioners*, 394 U.S. 802 (1969) ....................... 50, 51

*McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995) ..................... 36, 55

*Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) ............................... 33

*Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002) ......................... 16, 30

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ............................................. 43

*Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) .................. 52

*Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, (S.D.
    Ohio June 7, 2016) ............................................................................................... passim

*O'Brien v. Skinner*, 414 U.S. 524 (1974) ................................................................... 51

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)........................................................ passim

*Ohio State Conference of NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio).................... passim

*Ohio State Conference of NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014) ........................ passim

*Ohio State Conference of NAACP v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir.
    Oct. 1, 2014) ............................................................................................................... 2, 12

*Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306 (3d
    Cir. 1994) ......................................................................................................................... 25

*Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................. 5

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000) .................................................................... 32

*Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996) ...................................................................... 32

*SEIU v. Husted*, Nos. 2:12-CV-562, 2:06-CV-896, 2012 WL 5497757 (S.D. Ohio, Nov.
    13, 2012) ............................................................................................................................ 5

*Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013)..................................................................... 16, 31

*Stewart v. Blackwell*, 444 F.3d 843 (6th Cir. 2006)................................................................ 18, 24

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct.
    2507 (2015)...................................................................................................................... 16

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ......................................................................... passim

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .................................................... 43

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004) .................................................... 33

*United States v. City of Euclid*, 580 F. Supp. 2d 584 (N.D. Ohio 2008) ...................................... 5

*Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015).................................................................. passim

*Veasey v. Perry*, 815 F.3d 958 (5th Cir. 2016) ........................................................................... 17

*Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656 (2015) .................................................................... 43

**Statutes**

42 U.S.C. § 1973(a) .................................................................................................................... 33

52 U.S.C. § 10301........................................................................................................................ 25

**Other Authorities**

1982 U.S.C.C.A.N. ..................................................................................................................... 32

Brief of the Appellants, *NAACP II*, 768 F.3d 525, 2014 WL 4657242 ........................................ 30

**Rules**

Fed.R.Civ.P. 52(a)(6) .................................................................................................... 15

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Plaintiffs-Appellees request oral argument. The issues presented in this case are of substantial importance, involving the fundamental right to vote and the corresponding ability of thousands of Ohio voters—including in particular Ohio's minority voters—to participate in the electoral process and elect candidates of their choice. Oral argument would assist the Court in deciding these important issues.

# INTRODUCTION

Following a trial on the merits, the district court issued a comprehensive, 120-page opinion in which it found, based on careful consideration of the facts, that Ohio's elimination of "Golden Week"—the first five days of early voting, when voters can register and vote at the same time—imposed a racially disparate burden on the right to vote. Dist. Ct. Op. ("Op."), R. 117, PageID# 6147-70. The court also analyzed the ongoing effects of Ohio's history of discrimination against African Americans and found that the elimination of Golden Week "interacts with the historical and social conditions facing African Americans in Ohio to reduce their opportunity to participate in Ohio's political process relative to other groups of voters." *Id.* at PageID# 6223-29. With respect to the State's interests in eliminating Golden Week, the district court found, based on the evidence presented, that "Defendants' justifications … while they may be legitimate, *are minimal, unsupported, or not accomplished* by" the law that the State passed; Golden Week was eliminated "based upon tenuous justifications"; and "Defendants have failed to establish that the justifications are 'actually necessary' to burden the right to vote of African Americans." *Id.* at PageID# 6170-78, 6229 (emphasis added).

It follows from these determinations—and the meticulous and uncontested findings of fact in which they are grounded—that the elimination of Golden Week violates the Voting Rights Act ("VRA") and the Fourteenth Amendment. In

arguing to the contrary, the State relies on fanciful legal theories that have previously been rejected by this Court and other courts of appeals and run contrary to the purpose of the VRA and U.S. Supreme Court precedent. The judgment of the district court should be affirmed.

## STATEMENT OF THE ISSUES

1.     Did the district court err in finding that the elimination of Golden Week violates the VRA?

2.     Did the district court err in finding that the elimination of Golden Week violates the Fourteenth Amendment?

## STATEMENT OF THE CASE AND FACTS

### A.     Ohio's History of Racial Discrimination and Its Ongoing Effects

Ohio has a lengthy history of discrimination against African Americans that dates back to its original 1802 constitution. Op., R. 117, PageID# 6224; *see also* PX0109, R. 128-40, PageID# 11078-80. Such discrimination has continued into the modern era in various forms, including through measures that dilute the ability of minorities to elect representatives of their choice and laws that enhance the opportunity for discrimination against minority groups. Op., R. 117 PageID# 6225; PX0107, R. 128-38, PageID# 10111-12; PX0109, R. 128-40, PageID# 10180-82; *see also Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 530-31 (6th Cir. 2014) ("*NAACP II*"), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Ohio State Conference of NAACP v. Husted*, 43

F. Supp. 3d 808, 833 (S.D. Ohio) ("*NAACP I*"), *aff'd*, 768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

The ongoing effects of this history are plain: "there is extensive inequality in the state of Ohio on all" measures for African Americans. Transcript, R. 97, PageID# 3973. "[I]n many cases, ... no … conclusions [] can be drawn other than that" African Americans face "severe and persistent racial disparities" in health, education, employment, access to housing and transportation, and income. *Id.* at PageID# 3981. The district court found that, relative to whites, African Americans in Ohio "are more likely to be subject to economic, transportation, time, and childcare constraints that increase the cost of voting." Op., R. 117, PageID# 6162; *see also* PX0109, R. 128-40, PageID# 10136, 10166-68, 10175-76. They "are less likely to work in professional and managerial jobs; are more likely to work in service and sales jobs, including hourly wage jobs; have lower incomes; are nearly three times more likely to live in poverty; and are more than two and a half times more likely to live in a neighborhood in which more than 20% of the residents are in poverty." Op., R. 117, PageID# 6162; *see also* PX0109, R. 128-40, PageID# 10136, 10166-68, 10175-76. Further, they "are generally more transient and rely more heavily on public transportation than whites." Op., R. 117, PageID# 6163; *see* PX0109, R. 128-40, PageID# 10161-62. These ongoing effects of

discrimination "hinder African Americans' ability to participate in the political process." Op., R. 117, PageID# 6226.

Statements by public officials and recent racial appeals in campaigns demonstrate that race remains a consideration for officials involved in setting election policy. In 2012, the Chairman of both the Franklin County Republican Party and the Franklin County Board of Elections, explained, in defense of his vote not to permit weekend and evening early voting in Columbus prior to the 2012 election, that "I guess I really actually feel we shouldn't contort the voting process to accommodate the urban — read African-American — voter-turnout machine."[1] *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at \*30 (S.D. Ohio June 7, 2016) ("*NEOCH II*"). In a 2014 legislative hearing, State Representative Matt Huffman stated, "[t]here's that group of people who say, 'I'm only voting if someone drives me down after church on Sunday.' … Really? Is that the person we need to cater to when we're making public policy about elections?" PX0109, R. 128-40, PageID# 10192. And in the two most recent presidential elections, Ohio campaigns featured racial appeals. Op., R.117, PageID# 6226-27; PX0109, R. 128-40, PageID# 10186-89.

---

[1] The district court excluded this statement here. Order, R. 116, PageID# 6117-18. While Plaintiffs believe this statement should have been, *see* Pls.' Br., R. 112, PageID# 6040-45, this issue is of largely academic interest given that this Court plainly may look to pertinent findings of fact by another district court.

In this context, it is unsurprising that many African Americans in Ohio are distrustful of the elections system, Transcript, R. 96, PageID# 3601-04, 3645, 3658, or that courts have repeatedly been compelled in recent years to enjoin voting practices that burdened the rights of poor and/or minority voters in Ohio. *See Obama for Am. v. Husted*, 697 F.3d 423, 425-27 (6th Cir. 2012) ("*OFA*"); *NEOCH II*, 2016 WL 3166251, at \*55; *SEIU v. Husted*, Nos. 2:12-CV-562, 2:06-CV-896, 2012 WL 5497757, at \*5 (S.D. Ohio, Nov. 13, 2012); *Harkless v. Husted*, No. 1:06-cv-02284, 2011 WL 2149179, at \*3, \*26 (N.D. Ohio Mar. 31, 2011); *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 825, 827 (N.D. Ohio 2006); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 609 (N.D. Ohio 2008); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 699, 703-04 (N.D. Ohio 2006).

## B.    Ohio's Troubled Election History and Attempted Reforms

In recent years, Ohio's election administration has failed not just African Americans, but voters in general. In the 2004 general election—a mere three presidential election cycles ago—"Ohio saw several election administration problems, including extremely long lines at the polls." Op., R. 117, PageID# 6144; *see also id.* at PageID# 6156 ("manifold problems experienced during the 2004 election"); Transcript, R. 96, PageID# 3738-40 (one of the "worst election cycles"); Transcript, R. 102, PageID# 5052 (knows of no other state that had lines as long as Ohio's lines); *NAACP II*, 768 F.3d at 530-31. Wait times to vote lasted up to *10*

*hours*, and while voters across Ohio suffered, the impact on Ohio's minority voters was particularly severe: voters in predominantly African-American precincts in Franklin County had to wait up to 30 minutes longer on average than white voters to vote. Transcript, R. 102, PageID# 5034-35, 5056-57; *see also* PX0113, R. 128-44, PageID# 10251.

In an effort to remedy these disastrous, racially disparate problems, Ohio expanded access to the polls in 2005, adopting a 35-day no-excuse absentee and early in-person voting ("EIP") period and other reforms. Op., R. 117, PageID# 6144, 6156; *see also* Ohio Rev. Code § 3509.01(B)(2)-(3); *NAACP II*, 768 F.3d at 531. These reforms helped: "a large number of voters," particularly Ohio's minority voters, "took advantage of early voting." Op., R. 117 PageID# 6145; PX0109, R. 128-40, PageID# 10200; *see also OFA*, 697 F.3d at 426. But significant problems remained. "[V]oters in Ohio's largest counties still waited in significantly long lines to vote early and on Election Day in 2008 and 2012[,]" with lines reaching up to six hours in length. Op., R. 117, PageID# 6145; *see, e.g.*, Transcript, R. 96, PageID# 3744-45, 3747-48; Transcript, R. 97, PageID# 3878, 4006-09, 4028-29; Transcript, R. 101, PageID# 4836; Transcript, R. 102, PageID# 4929; Transcript, R. 103, PageID# 5099-89.

Any hope that these ongoing problems would be addressed faded in the wake of the 2008 and 2012 elections in which Barack Obama was elected president,

carried Ohio, and overwhelmingly won the African-American vote. *See* Transcript, R. 103, PageID# 5275-76, 6702; DX14, R. 127-14, PageID# 6698. Instead, Republican officials began to dismantle Ohio's post-2004 election reforms and blocked further expansion of access to the polls. *See* Op., R. 117, PageID# 6145; Transcript, R. 96, PageID# 3598-99; Transcript, R. 104, PageID# 5490-92. Those efforts specifically targeted many of the very reforms upon which Ohio's minority voters had come to heavily and disproportionately rely. *See* DX14, R. 127-14, PageID# 6702; PX0109, R. 128-40, PageID# 10185; Transcript, R. 103, PageID# 5278.

### C.    The Challenged Provisions

In 2013 the Republican-controlled Ohio General Assembly enacted a series of bills—SB238, SB200, SB205, and SB216—that reduced access to voting and targeted aspects of Ohio's election regime on which African Americans disproportionately relied. SB238 eliminated Golden Week, the five-day period at the beginning of EIP voting during which voters are able to register and vote on the same day ("same day registration" or "SDR"). PX0025, R. 128-14, PageID# 9862-66; Op., R. 117, PageID# 6145, 6156. SB200 reduced the number of DRE voting machines that counties are required to have. PX0022, R. 128-11, PageID# 9796-806. SB205 prohibited county boards of elections and local governments from sending voters unsolicited absentee ballot applications and including pre-paid

-7-

postage for returning absentee ballots; barred the Secretary of State from sending out unsolicited absentee ballot applications absent specific authorization from the legislature; and added required fields on the absentee ballot envelope. PX0023, R. 128-12, PageID# 9807-28. SB216 added required fields on the provisional ballot affirmation form; reduced by three days the cure period for provisional ballots cast for lack of an ID; prevented elections officials from completing on a voter's behalf the information required on the provisional ballot affirmation form; and gave counties the discretion—but did not require them—to consolidate poll books at multi-precinct locations so as to prevent disenfranchisement through the casting of ballots at the right location but wrong precinct. PX0024, R. 128-13, PageID# 9829-61.

All four bills passed largely or strictly on party lines. PX0033, R. 128-22, PageID# 9909; PX0034, R. 128-23, PageID# 9935-41; PX0035, R. 128-24, PageID# 9959, 9969-73; PX0036, R. 128-25, PageID# 10000-02; PX0037, R. 128-26, PageID# 10024-32; PX0038, R.128-27, PageID# 10049-51; *see also* PX0119, R. 128-46, PageID# 10279-85. No minority members of the House or Senate voted for any of these bills.

### D.    Use of EIP Voting and SDR

The law that eliminated Golden Week, SB238, was enacted despite widespread knowledge that minorities in particular relied heavily on Golden Week

and with little to no justification for its repeal. Crediting Plaintiffs' expert, Dr. Timberlake, the district court found that "over 60,000 people voted during Golden Week in 2008, and over 80,000 people voted during Golden Week in 2012." Op., R. 117, PageID# 6157-58; PX0109, R. 128-40, PageID# 10195; Transcript, R. 97, PageID# 3907. In 2008, nearly 13,000 voters took advantage of the opportunity to register and vote at the same time, and over 14,000 voters did so in 2012. PX0109, R. 128-40, PageID# 10195; Transcript, R. 97, PageID# 3907. Moreover, with respect to just EIP voting, which provides Ohio's voters with additional days to vote outside of Election Day, "in 2008, 19.9% of Ohio's African American voters made use of EIP voting compared to only 6.2% of whites[, and] [i]n 2012, 19.6% of blacks used EIP voting versus 8.9% of whites." Op., R. 117, PageID# 6159; PX0109, R. 128-40, PageID# 10198-99. The district court noted that even a defense expert found that African-American voters used EIP voting at higher rates than whites in 2010 and 2014. Op., R. 117, PageID# 6159; Transcript, R. 98, PageID# 4151. All told, while Golden Week was used by many Ohio voters, "the usage rates . . . were far higher among African Americans than among whites in both 2008 and 2012." Op., R. 117, PageID# 6159; PX0110, R. 128-41, PageID# 10228.

The district court also credited testimony from Plaintiffs' experts, as well as numerous lay witnesses who have experience working with Ohio voters as county

electoral board members, candidates, political party or campaign volunteers, or religious leaders, that voters who have greater time and resource limitations, particularly African Americans, will disproportionately bear the burdens of losing EIP voting days and SDR. Op., R.117, PageID# 6159-61, 6162-64. Specifically, the district court found that African Americans are more likely than whites "to be subject to economic, transportation, time, and childcare constraints that increase the cost of voting," and they are more likely to work hourly jobs, have lower incomes, live in poverty, have no or limited access to a vehicle, and to be transient. Op., R. 117, PageID# 6162-64. Thus, the district court found the elimination of Golden Week, which removes the opportunity to register and vote in the same place on the same day, imposes a disproportionate burden on African Americans, as does having to wait in the longer lines that will result the reduction in EIP voting days. Op., R. 117, PageID# 6160-62; PX0113, R. 128-44, PageID#10258-62; Transcript, R. 96, PageID# 3647-48, 3700-01; Transcript, R. 97, PageID# 3832-35; Transcript, R. 101, PageID# 4813-14; Transcript, R. 102 PageID# 5038; Transcript, R. 104, PageID# 5381-82; PX0109, R. 128-40, PageID# 10194. Indeed, it is precisely because these burdens fall more heavily on African Americans that they are more likely to use SDR and to vote EIP in the first place. *See* Op., R. 117, PageID# 6162, 6164 (discussing costs alleviated by SDR).

**E.      History of Court Challenges And Procedural History**

In 2014, the Ohio State Conference of the NAACP filed suit challenging the
elimination of Golden Week and the reduction in EIP voting in *Ohio State
Conference of NAACP v. Husted*, 2:14-CV-404 (S.D. Ohio).[2] Following discovery
and a hearing, Judge Economus of the Southern District of Ohio issued a detailed
decision holding that the State had likely violated the Constitution and the VRA
and granting preliminary injunctive relief. *NAACP I*, 43 F. Supp. 3d at 852-53; Op.,
R. 117, PageID# 6151. This Court affirmed on September 24, 2014, just weeks
before the then-pending general election. *NAACP II*, 768 F.3d at 533-60; Op., R.

---

[2] The State mischaracterizes the district court's use of the *NAACP I* and *NAACP II*
decisions in its brief by stating that "[t]he district court suggested that only this
Court could depart from *NAACP*." Appellants' Br. 2, 31. The district court
thoroughly analyzed the procedural history of the *NAACP* litigation and explained
that "[a]lthough the Court finds that the Sixth Circuit's vacated opinion in [*NAACP
II*] is not binding, the Court is free to find the reasoning therein persuasive." Op.,
R. 117, PageID# 6152 (citations omitted). "Accordingly, the Court will give
persuasive effect to the Sixth Circuit's vacated opinion as it sees fit, keeping in
mind that the Sixth Circuit's opinion was vacated for reasons unrelated to the
merits." *Id*. The only support cited by the State for this mischaracterization is the
district court's order granting in part and denying in part its motion for a stay of the
injunction pending appeal. Appellants' Br. 2. There, the court explained that "[t]his
Court, given the guidance provided by [*NAACP*], declines to find that legal
arguments that have been squarely rejected by the Sixth Circuit support a finding
that Defendants are likely to succeed on the merits of those arguments on appeal."
Order, R. 125, PageID# 6304. As that context makes clear, the district court did not
suggest that it was bound by the *NAACP II* decision. For the reasons explained by
the district court, *see* Op., R. 117, PageID# 6151-52, the *NAACP I* and *NAACP II*
decisions remain persuasive authority, and the district court was correct to utilize
their analysis here. *See also* Plaintiffs' Trial Brief, R. 79, PageID# 2636-37
(explaining persuasive value of *NAACP I* and *NAACP II*).

117, PageID# 6151. Shortly thereafter, the Supreme Court stayed enforcement of the order, *see Husted v. Ohio State Conference of NAACP*, 135 S. Ct. 42 (Sept. 29, 2014), based on the *Purcell* doctrine, pursuant to which the Court has often acted in recent years to stay decisions that would result in changes to election laws on the eve of an election. Op., R. 117, PageID# 6151. The Supreme Court did not address the merits of the case. *See* Op., R. 117, PageID# 6157 n.12. Because the preliminary injunction applied by its terms only to the 2014 election, this Court vacated the injunction. *Ohio State Conf. of the NAACP v. Husted*, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). The parties in the *NAACP* case subsequently reached a settlement that reinstated certain days and times for EIP voting. Op., R. 117, PageID# 6151; DX14K, R. 127-14, PageID# 6775-77.

On May 8, 2015, Plaintiffs filed this action challenging the elimination of Golden Week and other voting restrictions under the United States Constitution and Section 2 of the VRA, 52 U.S.C. § 10301. Compl., R.1, PageID# 1; Op., R. 117, PageID# 6123. The underlying litigation proceeded on an expedited basis and a trial on the merits took place from November 16 through December 3, 2015.

On May 24, 2016, the district court issued its Findings of Fact and Conclusions of Law (R. 117) and Final Judgment (R. 118) finding, in pertinent part, that the elimination of Golden Week violated the Equal Protection Clause of the Fourteenth Amendment and the VRA. Op., R. 117, PageID# 6242. Accordingly,

the district court permanently enjoined SB238. Judgment, R. 118, PageID# 6243. Subsequently, the district court granted in part and denied in part a request from the State to stay its decision. Order, R. 125, PageID# 6308. As a result, the district court's injunction is stayed until the August 2, 2016 Ohio elections, and will take effect after that date. *Id.* The injunction will be in place for the November 2016 elections. *Id.*

## SUMMARY OF THE ARGUMENT

The district court's decision below marked the third time that a federal court has found that Ohio's elimination of Golden Week violated or likely violated Section 2 of the VRA and the Fourteenth Amendment. The court based its conclusions on numerous detailed factual findings and the clearly established case law of this Court. It should be affirmed.

In particular, the district court concluded that the elimination of Golden Week violated Section 2 of the VRA after carefully applying the two-part test previously articulated by this Court for such claims. First, it examined whether the elimination of Golden Week had a disparate impact on a protected minority group and correctly concluded that it did. To meet this prong, Plaintiffs were not required to show that the elimination of Golden Week made voting impossible for minorities, but only that it made voting or registration disproportionately more burdensome—a fact that was amply established by evidence presented by both

Plaintiffs' and *Defendants'* experts, which showed that African Americans used Golden Week to register and vote at far greater rates than whites did. Second, the district court assessed whether, under the totality of the circumstances, that disproportionate burden is linked to the ongoing effects of discrimination. Again, the court correctly concluded that it is, finding that due to Ohio's long history of discrimination, African Americans experience many more socioeconomic challenges than whites do and that these particular challenges make it harder for them to participate in the political process—especially in the wake of losing SDR and additional days of EIP voting. The conclusion that Ohio's elimination of Golden Week violates Section 2 follows directly from these fact-intensive findings.

Similarly, the district court concluded that the elimination of Golden Week violated the Fourteenth Amendment by applying this Court's precedent, which has repeatedly held that voting laws that impose more than minimal burdens on the right to vote trigger heightened scrutiny. The State's argument that the law should be reviewed through a "rational basis" lens relies on semantics rather than substance, in an effort to shield the State from appropriate constitutional scrutiny. Throughout its opinion, the district court clearly stated it was describing the burdens imposed by the elimination of Golden Week as "more than minimal" and, therefore, under this Court's and the Supreme Court's well-established precedent, the State was required to come forward with more than vague, unsubstantiated

justifications for the law—that is, the burdens imposed by the elimination of Golden Week meant that it had to be "justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion). At every turn, the State failed to meet this burden. Because the State could not proffer any credible evidence to demonstrate that the elimination of Golden Week furthered legitimate state interests, the district court properly found that its repeal violated the Fourteenth Amendment.

## STANDARD OF REVIEW

A district court's factual findings after a bench trial are reviewed for clear error. *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015). "In reviewing factual findings for clear error, 'the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.'" *Id.* (quoting Fed. R. Civ. P. 52(a)(6)). Under this standard, the Court "cannot find that the district court committed clear error where there are two permissible views of the evidence, even if we would have weighed the evidence differently." *Id.* (internal quotation marks, citations, and brackets omitted). Legal conclusions are reviewed *de novo*. *Id.*

**ARGUMENT**

**I.    OHIO'S ELIMINATION OF GOLDEN WEEK VIOLATED THE VRA**

**A.    Legal Standard**

"With Section 2 [of the VRA], Congress effectuated a 'permanent, nationwide ban on racial discrimination' because 'any racial discrimination in voting is too much.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014) ("*LWV*") (quoting *Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2631 (2013)). As such, the VRA must "be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal quotation marks omitted). Indeed, "Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent. Instead, a plaintiff need show only that the challenged action or requirement has a discriminatory effect on members of a protected group[.]" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002); *cf. Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522 (2015) ("Recognition of disparate-impact liability … plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract

unconscious prejudices and disguised animus that escape easy classification as disparate treatment.").[3]

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Consistent with other circuits, this Court has interpreted this language to require courts to conduct a two-part analysis when evaluating a Section 2 vote-denial claim. First, the court examines whether the challenged practice has a disparate impact on a protected minority group. *NAACP II*, 768 F.3d at 554; *see also Veasey v. Abbott*, 796 F.3d 487, 504 (5th Cir. 2015) (adopting and applying two-part test), *reh'g en banc granted*, 815 F.3d 958 (5th Cir. 2016); *LWV*, 769 F.3d at 240 (same). Plaintiffs need not show that the challenged practice makes voting impossible for minorities; they need only show that the practice makes voting disproportionately more burdensome for minorities. *NAACP II*, 768 F.3d at 552; *Stewart v. Blackwell*, 444

---

[3] Section 2 of the VRA provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State … in a manner which results in a denial or abridgement of the right of any citizen … to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of Section 2 "is established if, based on the totality of the circumstances, it is shown that the political processes … in the State … are not equally open to participation by members of" a particular racial group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

F.3d 843, 877 (6th Cir. 2006); *LWV*, 769 F.3d at 243. If a court finds a disparate burden, it then must assess whether "that burden [is] in part caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *NAACP II*, 768 F.3d at 554 (quoting *Gingles*, 478 U.S. at 47); *see also Veasey*, 796 F.3d at 505; *LWV*, 769 F.3d at 240. At both stages of the inquiry, the court must look at the "totality of the circumstances," engaging in "an intensely local appraisal of the design and impact of the challenged electoral practice." *Stewart*, 444 F.3d at 878 (citation and internal quotation marks omitted); *Gingles*, 478 U.S. at 75 (whether "the political processes are equally open depends upon a searching practical evaluation of the past and present reality") (citations and internal quotation marks omitted).

As part of the "totality-of-the-circumstances" evaluation, courts look at nine factors that were originally identified in the Senate Judiciary Committee majority report accompanying the 1982 amendments to Section 2 (the "Senate Factors"). *NAACP II*, 768 F.3d at 554-55; *see also Veasey*, 796 F.3d at 504; *LWV*, 769 F.3d at 240. These factors include the history of voting-related discrimination in the jurisdiction; the extent of racially polarized voting; and the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. *See Gingles*, 478 U.S. at 36-37. "[T]here is no

requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (citation and quotation marks omitted).

## B.    The District Court Correctly Found a Violation of Section 2

In finding that the elimination of Golden Week violates Section 2 of the VRA, the district court properly applied the two-part test to the facts it found on the record in this case. With respect to the first element, the district court found that "[t]he elimination of the extra days for EIP voting provided by Golden Week will disproportionately burden African Americans, as expert and anecdotal evidence reflects that African Americans vote EIP, and specifically EIP during Golden Week, at a significantly higher rate than other voters"; that the elimination of Golden Week will result in longer lines to vote that disproportionately burden African Americans; *and* that the elimination of Golden Week's opportunity to register and vote at the same time will disproportionately burden African Americans. Op., R. 117, PageID# 6158-64. With respect to the second element, the court found that the elimination of Golden Week "interacts with the historical and social conditions facing African Americans in Ohio to reduce their opportunity to participate in Ohio's political process relative to other groups of voters." Op., R. 117, PageID# 6223-29; *see also id.* at PageID# 6161 ("African Americans will disproportionately bear [the burden of longer lines], because . . . they have greater time and resource limitations that may prevent them from waiting in line on

Election Day and are less likely to vote absentee."); *id.* at PageID# 6162 ("[V]oters must now register and vote at separate times, which increases the 'cost of voting,' especially for socioeconomically disadvantaged groups."); *id.* at PageID# 6223-30 (discussing Senate Factors). *See generally NAACP II*, 768 F.3d at 554 (Senate Factors relevant "particularly with regard to the second element"); *Veasey*, 796 F.3d at 505.

These findings were heavily grounded in the district court's underlying factual determinations. For example, after the district court meticulously reviewed and analyzed reports and testimony presented by eight expert witnesses, *see* Op., R. 117, PageID# 6128-44 (discussing witnesses presented), it weighed each expert's opinion and credited Dr. Timberlake's finding that African Americans in Ohio disproportionately used Golden Week and EIP voting. Op., R. 117, PageID# 6133, 6157-59; PX0109, R. 128-40, PageID# 10146; Transcript, R. 97, PageID# 3907-10, 3919-21, 3925-28, 3932-33. The district court further noted that the findings of Dr. McCarty, the State's expert, supported Dr. Timberlake's conclusion, *see* Op., R. 117, PageID# 6159 (rate of African Americans using EIP voting in 2010 and 2014 was higher than the rate for whites), and that data from the Current Population Survey supported this conclusion as well. *See id.* The district court also considered the testimony of over twenty-one fact witnesses, including at least nine Ohio election officials, *see id.* at PageID# 6128-44 (discussing witnesses presented), and

found that this direct evidence "corroborated" the expert evidence and district court's conclusions. *Id.* at PageID# 6160. Thus, the district court made a well-supported *factual* determination that the elimination of Golden Week disproportionately burdens African Americans.

The district court also conducted a fact-intensive analysis to conclude that the social and historical conditions present in Ohio interacted with the elimination of Golden Week to make it harder for African Americans in particular to participate in the political process. For instance, the district court credited Dr. Timberlake's findings as well as the testimony of multiple lay witnesses that African Americans in Ohio face severe socioeconomic disadvantages—such as lower levels of education, decreased access to vehicles, lower income, a greater likelihood of working hourly wage jobs, and increased transience—that decrease their ability (relative to other voters) to participate in the political process. *Id.* at PageID# 6162-63, 6226. The district court also made the factual finding that SDR specifically alleviated the costs that voters face, particularly socioeconomically disadvantaged voters, from having to register and vote at separate times. *Id.* at PageID# 6162. With the elimination of Golden Week—the only time during which Ohio's voters could avail themselves of SDR—the district court found that it would be more difficult for "voters with time, resource, transportation, and childcare restraints" to both register and vote and, "unfortunately, African

Americans in particular are more likely" to be subject to the aforementioned constraints. *Id.*

Likewise, the district court found that voters who otherwise would have voted on the repealed EIP voting days would now (absent an injunction) need to vote on other early voting days or Election Day (or not vote at all). *Id.* at PageID# 6160. Citing both Plaintiffs' expert Dr. Yang and the State's expert Dr. Allen, the district court found that this shifting of voters to different days would, inevitably, result in longer lines and wait times. *Id.* at PageID# 6160-61. As noted, these longer lines and wait times would disproportionately impact African Americans because "they have greater time and resource limitations [such as limited access to transportation and childcare and less flexible job schedules] that may prevent them from waiting in line on Election Day[.]" *Id*. at PageID# 6160-61, 6163-64. Accordingly, the district court found that the resultant lines would interact with the ongoing effects of discrimination to make it more difficult for African Americans to vote. *Id.* at PageID# 6160-61.

Contrary to the State's assertions, *see* Appellants' Br. 58-60, the district court did not make these findings in an electoral system vacuum. Rather, it looked at the totality of the circumstances and considered Ohio's entire voting and electoral scheme. Op., R. 117, PageID# 6164-70. As explained by the district court, even being "mindful of the numerous opportunities to cast a ballot in Ohio," *id.* at

PageID# 6164, the factual evidence presented showed that the other voting opportunities available in Ohio were not sufficient to eliminate or decrease the burdens posed for African-American voters from the elimination of SDR and reduction of EIP voting. *Id.* at PageID# 6165. Specifically, the district court found that African Americans are distrustful of voting by mail, *id.*; that voting by mail entails a financial cost and multiple steps that may not make it a viable alternative for African Americans, *id.* at PageID# 6166; and that Election Day voting—which requires separate trips for voting and registering—also may not be a viable alternative for African-American voters due to the socioeconomic disparities discussed above. *Id.* at PageID# 6167. Moreover, the court carefully considered the Senate Factors, Op., R. 117, PageID# 6223-29 ("Having considered all of the Senate Factors and the totality of the circumstances…."), which, as noted, inform the inquiry into the totality of the circumstances. *See NAACP II*, 768 F.3d at 554-55; *see also Veasey*, 796 F.3d at 504; *LWV*, 769 F.3d at 240. Accordingly, within Ohio's entire election context, the facts showed that African Americans are disparately burdened by SB238.

Notably, the State has not argued that the district court's factual findings are clearly erroneous. As discussed *supra*, moreover, both Judge Economus and a panel of this Court previously made or upheld similar factual findings. *See NAACP II*, 768 F.3d at 534-37, 550-55; *NAACP I*, 43 F. Supp. 3d at 841-44. Thus, three

courts have now found that African Americans are disparately burdened by SB238 and, as a result of the interaction between that law and the social and historical conditions present in Ohio, have less ability than other voters to participate in the political process and to elect candidates of their choice. Op., R.117, PageID# 6220; *NAACP II*, 768 F.3d at 534-37, 550-55; *NAACP I*, 43 F. Supp. 3d at 841-44.

### C.    The State's Arguments Are Without Merit

As noted above, "'[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *Stewart*, 444 F.3d at 879 (quoting *Gingles*, 478 U.S. at 47). The district court did just that—it carefully examined how the elimination of Golden Week interacted with the social and historical conditions in Ohio and found that it plainly caused inequality in the opportunities of African-American voters as compared to whites to elect their preferred representatives.

Citing the *Gingles* preconditions used in vote-*dilution* cases, the State advocates for a brand-new causal test that looks at the Senate Factors only after the court has found that the challenged practice—absent any socioeconomic or other factors—decreases minorities' ability to vote. *See* Appellants' Br. 58-60. But such a test is plainly contrary to the precedent of this Court, the U.S. Supreme Court,

and the plain language of Section 2.[4] *See, e.g.*, 52 U.S.C. § 10301; *Gingles*, 478 U.S. at 47; *NAACP II*, 768 F.3d at 554; *Veasey*, 796 F.3d at 505; *LWV*, 769 F.3d at 240.

The State also asserts that even if the district court was correct to examine the totality of the circumstances, it erred by failing to consider the voting regimes of other states as part of that analysis. This Court rejected that argument in *NAACP II* and, for the same reasons, it should reject that argument again today. As the Supreme Court has emphasized, a Section 2 analysis is "an *intensely local* appraisal of the design and impact of" electoral administration "in the light of past and present reality." *Gingles*, 478 U.S. at 78 (emphasis added). Thus, this Court correctly held in *NAACP II* that "[t]he focus is on the internal processes of a single State or political subdivision and the opportunities enjoyed by that particular electorate. The text of Section 2 does not direct courts to compare opportunities across States." 768 F.3d at 559; *see also LWV*, 769 F.3d at 243 (explaining that "Section 2, on its face, is local in nature" and the district court committed "grave

---

[4] The cases relied on by Defendants for this proposition are readily distinguishable, as the racial disparities in those cases were not caused by the challenged practices or their interaction with social and historical conditions but, rather, by other causes completely. *See Irby v. Va. State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989) (challenging appointment process for school board where cause of racial disparities was not the process itself but minorities' decision not to seek school board seats and there was no finding that this was connected to socioeconomic factors); *Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 313-14 (3d Cir. 1994) (cause of minorities being purged from voter rolls was not the statute, but voters' decision not to vote).

error" by relying on practices in other states to "suggest[] that a practice must be discriminatory on a nationwide basis to violate Section 2"); *NEOCH II*, 2016 WL 3166251, at *50 n.20 (a Section 2 analysis is a local analysis).

Ironically, the State's argument on this point demonstrates precisely why the Section 2 analysis must be local in nature: states have widely varying electoral schemes and histories that make facile apples-to-apples comparisons misleading. While the State trumpets its purported leadership in early voting on one metric—the length of its early voting period—it fails to mention that, unlike many states that have numerous early voting locations, Transcript, R. 102, PageID# 5005-07; Transcript, R. 103, 5229-13, 5233-36, Ohio permits counties to have only a single early voting location *per county*, Op., R. 117, PageID# 6179. As a result, voters in Ohio had to wait in untenably long lines to vote *even before SB238 eliminated part of the early voting period*. As explained above, moreover, Ohio's early voting period was adopted as a necessity, in the wake of the disastrous 2004 election, making any comparison between early voting in Ohio and any other state even more inapt. Thus, the district court's decision not to compare Ohio's early voting period to those of other states was sound on both legal and factual grounds.

Moreover, the State's argument about the alleged importance of a "macro" showing of inequality also fails. Appellants' Br. 52-55. To begin with, the only case law that supports the approach for which the State advocates is *Frank v.*

*Walker*, 768 F.3d 744 (7th Cir. 2014). *See* Appellants' Br. 53. That decision, which the Seventh Circuit declined to review en banc by an equally divided 5-5 vote, 773 F.3d 783 (2014) (Posner, J., dissenting), is deeply flawed and should be found to have no persuasive force here.

For instance, the *Frank* court, after referring to *LWV*, *NAACP II*, and the nine *Gingles* factors (i.e., the Senate Factors), wrote that "[t]he Fourth Circuit and the Sixth Circuit … found *Gingles* unhelpful in voter-qualification cases (as do we)." 768 F.3d at 754. But that is flatly incorrect. *See NAACP II*, 768 F.3d at 554 ("[W]e see no reason why the Senate factors cannot be considered in assessing the 'totality of the circumstances in a vote denial claim, particularly with regard to the second element. … And several of the few Circuit court decisions to address vote denial claims have expressly stated that the Senate factors are relevant to vote denial claims."); *id.* at 555 (finding "Senate factors one, three, five, and nine particularly relevant to a vote denial claim" but that "[a]ll of the factors … can still provide helpful background context to minorities' overall ability to engage effectively on an equal basis with other voters in the political process"); *LWV*, 769 F.3d at 240 (Senate Factors "may shed light on whether the two elements of a Section 2 claim are met"). In addition, while this Court, the Fourth Circuit, and the Fifth Circuit have all applied the two-part test for VRA vote-denial claims set forth above, *see Veasey*, 796 F.3d at 504 ("We now adopt the two-part framework

employed by the Fourth and Sixth Circuits to evaluate Section 2 'results' claims."),

the *Frank* court wrote that it was "skeptical about the second of these steps,

because it does not distinguish discrimination by the defendants from other

persons' discrimination." 768 F.3d at 755. This makes *Frank* not only an outlier

among the courts of appeals, *see Veasey*, 796 F.3d at 594 n.7, but also difficult to

square with the Supreme Court's instruction that the VRA "should be interpreted

in a manner that provides the broadest possible scope in combating racial

discrimination" given that Congress enacted it "for the broad remedial purpose of

rid[ding] the country of racial discrimination in voting." *Chisom*, 501 U.S. at 403.

In short, the State's reliance on *Frank* is misplaced.

In any event, *Frank* wrote that it was "not saying that, as long as blacks

register and vote more frequently than whites, a state is entitled to make changes

for the purpose of curtailing black voting," and explained that its point in citing

registration and turnout statistics was that courts considering the totality of the

circumstances should "look at everything." 768 F.3d at 753-54. In other words,

even the *Frank* court thought that such statistics are simply one of many pieces of

evidence that is relevant to the totality of the circumstances. Indeed, there are many

reasons (such as the candidacies of President Obama) that could have caused

African-American registration and turnout to spike in recent elections

notwithstanding persistent inequality of opportunity in the voting context; similar

registration rates and turnout rates for blacks and whites do not prove that there *is* equality of opportunity any more than racially disparate registration and turnout rates would prove that there is *not* equality of opportunity.

In addition, the relevant registration and turnout data here do not show what the State suggests. With respect to registration data, the State writes both that "African Americans registered at higher percentages than whites in 2008, 2010, 2012, and 2014" and that, "[a]t worst, the registration numbers are 'statistically indistinguishable' for every federal election from 2006 through 2014." Appellants' Br. 53. The source cited for these assertions—a report of defense expert Dr. Hood—makes only the latter claim. DX18, R. 127-18, PageID# 7366-67. And the key here is that the rates are *statistically* indistinguishable. The pertinent expert report shows that there is a large margin of error for black registration rates, *see id.*, making the probative value of this evidence limited, at best. Even more problematic, the defense expert who analyzed individual-level voter data, Dr. McCarty, found that from 2010 (when Golden Week was in effect) to 2014 (after Golden Week had been eliminated), African-American turnout *decreased* relative to white turnout. Transcript. R. 98, PageID# 4203-04, 4206-08. If anything, "macro" evidence supports the district court's holding.

The State's claim that the district court improperly failed to establish an objective benchmark and used a retrogression standard fails as well. As this Court and others have already found, any requirement that Section 2 plaintiffs identify an objective benchmark is only applicable in the vote-*dilution* context. *NAACP II*, 768 F.3d at 556;[5] *see also NEOCH II*, 2016 WL 3166251, at *48. The reason for this difference is clear: in a vote-denial case such as this one, the "benchmark" is "inherently provide[d]" in the text of the statute and it is "straightforward": "under the challenged law or practice, how do minorities fare in their ability 'to participate in the political process' as compared to other groups of voters?" *NAACP II*, 768 F.3d at 556; *see also NEOCH II*, 2016 WL 3166251, at *48. This is precisely the question that the district court asked, and the answer is thoroughly supported by

---

[5] The case cited by the State in support of its benchmark argument, *Holder v. Hall*, 512 U.S. 874 (1994), is the same vote-dilution case that the Appellants unsuccessfully relied upon in making this argument in *NAACP II*. Brief of the Appellants at *36, *NAACP II*, 768 F.3d 525, 2014 WL 4657242. For the reasons set forth in *NAACP II*, *Holder* is not applicable here. In *Holder*, the plaintiffs challenged the county's failure to replace the only form of government that the county in question had ever had with an entirely new form, 512 U.S. at 877-78, and the Court found that where there was no other form of government available for comparison, this change was "inherently standardless" and could not be analyzed under Section 2. *Id.* at 885. In comparison, in this case Plaintiffs challenged the reduction and elimination of a voting mechanism that was in place for many years and, therefore, its "effect [] can be evaluated by comparing the system with that rule to the system without that rule." *See id.* at 880-81. There is simply no need for some "hypothetical benchmark." Further, *Moore*, 293 F.3d at 363-368, another case on which the State relies, is irrelevant to the instant analysis because that case held that Section 2 does not apply to appointive systems. *Id.* at 363-368.

the factual record: African Americans, as compared to whites, have less ability to participate in the political process as a result of the elimination of Golden Week. *See* Op., R. 117, PageID# 6219.

This Court has also previously rejected the State's argument that by "compar[ing] Ohio's current law to its old law" the district court in essence imported a Section 5 retrogression standard into its Section 2 analysis. Appellants' Br. 55-57. As this Court explained in *NAACP II*, a court does "not improperly engage in a retrogression analysis in considering the opportunities available to African Americans to vote EIP under the prior law as part of the totality of circumstances inquiry." 768 F.3d at 557-58 (quotation marks omitted). Appellants offer no persuasive reason for departing from this holding, which was compelled by the text of the VRA and Supreme Court precedent.[6]

Section 2 and Section 5 *both* apply to election law changes that make voting or registration more difficult and "some parts of the § 2 analysis may overlap with the § 5 inquiry." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003). As the Supreme

---

[6] The State's retrogression argument appears to be based in part on a misunderstanding of *Shelby County v. Holder*. Contrary to the State's assertions, *Shelby County* did not hold that the application of a disparate-impact retrogression standard was an intrusive and impermissible requirement. Rather, *Shelby County* found only that the coverage formula under Section 4 of the VRA was unconstitutional because it had not been updated. 133 S. Ct. at 2631. The Court made no holding with respect to Section 5 or its retrogression standard. *Id.* ("We issue no holding on § 5 itself, only on the coverage formula.").

Court explained in *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000), Section 5 applies "only to retrogression," whereas Section 2 challenges "involve *not only* changes [to voting laws, practices, and procedures] but (much more commonly) the status quo itself." *Id.* at 334 (emphasis added). Given this overlap, it is not surprising that the several courts that have considered the matter—including this Court—have found that consideration of past practices is properly part of Section 2's totality-of-the-circumstances analysis. *See NAACP II*, 768 F.3d at 557-58 (holding consideration of past practices appropriate and noting that "no case … holds that prior laws or practices cannot be considered in the … 'totality of the circumstances analysis'"); *LWV*, 769 F.3d at 241-42 (Section 2 has an "eye toward past practices" as part of its totality-of-the-circumstances test); *Sanchez v. Colorado*, 97 F.3d 1303, 1325 (10th Cir. 1996) ("'[i]f [a challenged] procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact'" (quoting 1982 U.S.C.C.A.N. at 207, n.117)); *NEOCH II*, 2016 WL 3166251, at *48. Thus, as the district court did in the instant case, courts may—and should—look to past practices as part of the Section 2 totality-of-the-circumstances analysis.

The State's constitutional-avoidance and clear-statement arguments are similarly meritless. As this Court recognized in *NAACP II*, "the plain language of Section 2 does not exempt early-voting systems from its coverage. Section 2

applies to *any* discriminatory 'standard, practice, or procedure ... which results in a denial or abridgement' of the right to vote. 42 U.S.C. § 1973(a). It does not specify that certain 'standard[s], practice[s], or procedure[s]' are included within its scope and others excluded." 768 F.3d at 552-53. Further, an unbroken line of cases decided over the past three decades has concluded that Section 2 is constitutional as applied to state practices that abridge the right to vote. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 990 (1996) (O'Connor, J., concurring) ("[a]gainst this background it would be irresponsible for a State to disregard the § 2 results test"); *Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984); *United States v. Blaine County*, 363 F.3d 897, 904-07 (9th Cir. 2004). And, as the Supreme Court has instructed and this Court has recognized, the VRA is to be interpreted as broadly as possible. *Chisom*, 501 U.S. at 403; *NAACP II*, 768 F.3d at 553. Thus, there is simply no question that Congress intended that Section 2 apply to *all* voting practices and procedures that make it harder for minorities than for other voters to participate in elections.

Finally, to the extent that the State argues that the district court's holding will have sweeping constitutional implications affecting other states and, therefore, must be avoided, this Court has rejected that reasoning. As explained in *NAACP II*, "[t]he focus is on the internal processes of a single State or political subdivision and the opportunities enjoyed by that particular electorate. The text of Section 2

does not direct courts to compare opportunities across States." 768 F.3d at 559. As such, the implications of any Section 2 analysis in this case as well as the district court's findings with respect to the constitutionality of Ohio's reduction in EIP voting and elimination of SDR do not reach beyond Ohio's borders and do not implicate the constitutionality of such practices in other states. Thus, contrary to the State's assertions, Appellants' Br. 63, there are no "serious constitutional questions" for this or any other court to avoid when applying Section 2's two-part results test. And the district court's finding of a VRA violation should be affirmed.[7]

---

[7] For the reasons set forth in Plaintiffs' Trial Brief, R. 79, PageID# 2699-2702, and Plaintiffs' Proposed Findings of Fact and Conclusions of Law, R. 111, PageID# 5929-42, 5991-92, this Court could also uphold the finding of a VRA violation on the alternative grounds that SB238 was intended disproportionately to suppress the vote of African Americans in Ohio. *See generally Chisom*, 501 U.S. at 394 & n.21. Indeed, although the court in *NEOCH II* declined to make a finding of discriminatory intent in assessing some of the provisions that were also at issue in the trial of this case, the *NEOCH II* court also wrote that it was "deeply troubled by the flurry of voting-related legislation introduced during the time period in question, all of which sought to limit the precious right to the franchise in some manner"; that "the Republican-controlled General Assembly's frenetic pace of introducing such legislation reflects questionable motives"; and that "[i]f the dog whistles in the General Assembly continue to get louder, courts considering future challenges to voting restrictions in Ohio may well find that intentional discrimination is afoot." 2016 WL 3166251, at *45. On the fuller record here— *NEOCH II* dealt with only a subset of the provisions that were challenged in this case—a finding of discriminatory intent was warranted.

## II.     OHIO'S ELIMINATION OF GOLDEN WEEK VIOLATES THE FOURTEENTH AMENDMENT

### A.     Legal Standard

"The right to vote is a 'precious' and 'fundamental' right." *OFA*, 697 F.3d at 428. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* Thus, "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Id.*

The Supreme Court has developed a "flexible standard," which it outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), for reviewing claims that a state has burdened voting rights. *OFA*, 697 F.3d at 429. That standard, which is typically referred to as the *Anderson-Burdick* balancing test, requires "[a] court considering a challenge to a state election law" to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

Under the *Anderson-Burdick* test, "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens" voting rights. *Id.*; *accord OFA*, 697 F.3d at 428

("The precise character of the state's action and the nature of the burden on voters will determine the appropriate equal protection standard."). "Most cases fall in between the[] two extremes" of strict scrutiny and rational-basis review, *Id.* at 429, and are "subject to ad hoc balancing." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995). Thus, "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *Id.* at 1221 n.6 (rejecting proposition that "election laws that impose less substantial burdens need pass only rational basis review"). In other words, "[h]owever slight [a] burden [on voting] may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation," *Crawford*, 553 U.S. at 191 (Stevens, J., controlling opinion) (citation and quotation marks omitted). Further, "[t]here is no 'litmus test' to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and 'make the 'hard judgment' that our adversary system demands.'" *OFA*, 697 F.3d at 429 (quoting *Crawford*, 553 U.S. at 190 (controlling opinion)) (some internal quotation marks omitted).

**B.    The Elimination of Golden Week Burdens Ohioans' Voting Rights**

The district court found that the elimination of Golden Week burdens the voting rights of Ohio's citizens in two ways: "(1) by reducing the overall EIP

voting period, and (2) by eliminating the opportunity of SDR." Op., R. 117, PageID # 6157. With respect to the reduction in the early voting period, the district court found that more than 60,000 people voted during the Golden Week period in 2008 and more than 80,000 did so in 2012. *Id.* at PageID# 6157-58. As a result of its elimination, "[i]ndividuals who would have voted during Golden Week in future elections must now vote on other days during the early voting period, vote absentee by mail, vote on Election Day, or not vote all." *Id.* at PageID# 6158. To the extent that these individuals choose to vote on other early voting days or on Election Day—as a number of voters surely would—the result will be an increase in Ohio's already intolerably long voting lines, which will increase the burdens for those who must wait in those lines and deter voting. *Id.* at PageID# 6160-61. And, as discussed above, the district court found that the burdens from the elimination of the option to vote during Golden Week fall disproportionately on lower-income and African-American voters, who were far more likely than other voters to vote during that period and will be disproportionately burdened by the resulting increase in wait times. *See supra* Statement of the Case and Facts Section D; Argument Section I.B; *see also NAACP I*, 43 F. Supp. 3d at 841 (making a similar finding); *NAACP II*, 768 F.3d at 539-42 (affirming district court's finding).

With respect to the burdens resulting from the elimination of the opportunity that Golden Week provided for SDR, the district court found that SDR alleviates

the costs to voters of having to register and vote at separate times. Op., R. 117, PageID# 6162. As noted, this is particularly valuable to voters with time, resource, transportation, and childcare restraints. *Id*.; *see also NAACP I*, 43 F. Supp. 3d at 850 (elimination of SDR will impact African Americans, as "they tend to disproportionately make up the groups that benefit the most from same-day registration: the poor and the homeless"); *NAACP II*, 768 F.3d at 551, 555 (affirming district court's finding of likely VRA violation). And this opportunity has been utilized by thousands of voters: In the 2008 general election, approximately 12,842 individuals used Golden Week to both register (including both new and updated registrations) and vote on the same day. Op., R. 117, PageID# 6161. In the 2012 general election, approximately 14,253 individuals used Golden Week to register and vote on the same day. *Id*. Of the 5,844 new registrations in 2012, 1,789 were in Ohio's three largest urban counties. *Id.* at PageID# 6161-62; DX15, R. 127-15, PageID# 7263.

Based on this evidence, the district court found that the elimination of Golden Week imposed a "modest" burden on the right to vote, which the court "define[d] as a more than minimal but less than significant burden." Op., R. 117, PageID# 6156-57. In making this finding, the district court specifically considered the other "opportunities to cast a ballot in Ohio, including vote by mail, in person on Election Day, and on other EIP voting days," *id.* at PageID# 6164, the

-38-

settlement in the *NAACP* case, *id.* at PageID# 6164-70, and the results of the 2014 election, and it found that none of these considerations ameliorated the burdens imposed by SB238. *Id.*

With respect to the other options for casting a ballot, the court found that these "options do not eliminate or significantly decrease the burden imposed on the right to vote of African Americans as a result of the elimination of Golden Week." Op., R. 117, PageID# 6164, 6167. In doing so, the court credited testimony that African Americans in Ohio are distrustful of voting by mail. *Id.* at PageID# 6165; *see also NAACP II*, 768 F.3d at 542 (affirming finding that voting by mail is not a viable alternative means of access to the ballot for African Americans, lower-income individuals, and the homeless because, *inter alia*, they are distrustful of the mail and/or voting by mail).

In addition, voting by mail entails greater costs to voting that make it unsuitable for many voters. As the district court found, it requires "correctly filling out an absentee ballot application, paying postage to return that application by mail or making arrangements to return the application in person, correctly filling out an absentee ballot, and paying postage (sometimes in irregular amounts) to return the ballot by mail or making arrangements to return it in person." Op., R. 117, PageID# 6166. "These costs and relatively complex requirements, coupled with evidence described above that African Americans tend to have more limited

financial, transportation, and childcare resources and lower levels of educational attainment, further [demonstrate] that voting by mail [is] not a suitable alternative for many African American voters." *Id.*; *see also NAACP I*, 43 F. Supp. 3d at 843 (finding same); *NAACP II*, 768 F.3d at 542 (same). Moreover, the elimination of Golden Week reduces "the overall period for voting by mail by the same amount as the time for EIP voting," thereby providing less time to vote by mail than before SB238's enactment. *NAACP I*, 43 F. Supp. 3d at 843.

The district court similarly made the factual finding that the "costs of registering and voting at separate times, the cost of voting in general, and evidence that African Americans fare worse in various socio-economic measures also reduce[d] the viability of Election Day voting as an alternative." Op., R. 117, PageID# 6167. Based on this evidence, the court found that Ohio's various voting "options do not eliminate or significantly decrease the burden imposed on the right to vote of African Americans as a result of the elimination of Golden Week." *Id.*

With respect to the settlement in the *NAACP* litigation, pursuant to which Ohio agreed to provide "EIP voting hours on two Saturdays and two Sundays and … for ten days where voting is permitted until either 6:00 p.m. or 7:00 p.m" in presidential general elections, the court found that "[t]he addition of those EIP voting hours somewhat reduce[d] the burden imposed by [SB238] today as compared to the burden it imposed in 2014 when Ohio did not provide those hours."

*Id.* at PageID#6168. The court found, however, that for the reasons it had articulated, "those hours do not eliminate the burden currently imposed by [SB238], nor do the hours ameliorate the burden such that it is outweighed by the State's tenuous justifications." *Id.*

As for the 2014 election—and, more specifically, defense expert Dr. McCarty's analysis of the results of that election—the district court accorded Dr. McCarty's conclusions little weight. "First, the probative value of his results [were] diminished by the fact that they are based on data from midterm as opposed to presidential elections. Midterm elections, which generally produce much lower turnout than presidential elections … may not paint an accurate picture of voter behavior." *Id.* at PageID# 6169. "Indeed, those who vote in midterm elections are arguably already higher-propensity voters." *Id.* Second, the court discredited the methodology that Dr. McCarty utilized in attempting to determine the race of individual voters. *Id.* at PageID# 6139-41, 6169. Third, the court noted that "Dr. McCarty's analysis … d[id] not meaningfully address the impacts of the elimination of SDR" and thus did "not change the Court's finding of the burden imposed by SDR's elimination." *Id.* at PageID# 6169. As a result, the court concluded that "the evidence regarding the 2014 midterm election does not persuasively indicate that [SB238] is not substantially likely to burden the right to

vote of African Americans in the 2016 general presidential election." *Id.* at

PageID# 6169-70.

> The court summarized its findings as follows:

> [T]he record includes statistical and anecdotal evidence reflecting that: over 10,000 voters have used EIP voting in the past; African Americans use EIP voting at significantly higher rates than whites; many thousands of individuals have used Golden Week in the past; African Americans used Golden Week at a significantly higher rate than whites in previous elections; the elimination of the early voting days will therefore burden African Americans; the elimination of SDR will increase the cost of voting for African Americans; and other voting mechanisms do not suffice to reduce these burdens. Thus, although the Court cannot predict how many African Americans will turn out in future elections, it is reasonable to conclude from this evidence that their right to vote will be modestly burdened by [SB238]'s reduction in the EIP voting period and elimination of SDR.

*Id.* at PageID# 6170.[8] Based on these extensive fact-findings, the district court's

conclusion that the burden imposed by SB238 was more than minimal, *id.* at

6156-57, was, if anything, understated.

## C.    The State Has Failed to Justify The Burdens Imposed On Voters By the Elimination of Golden Week

### 1.    The district court's conclusion that SB238 does not materially further state interests was amply justified by its findings of fact

The district court's factual findings further demonstrate that the State's

interests in the elimination of Golden Week are outweighed by the above-described

---

[8] The reference to "10,000 voters hav[ing] used EIP voting" appears to be a typo; as explained above, well over 100,000 votes were cast during Golden Week alone in the 2008 and 2012 presidential elections.

burdens on the right to vote. Initially, the State incorrectly argues that it need not produce any evidence supporting its purported justifications for SB238. Appellants' Br. 35-36. In support, the State cites three inapposite cases that dealt with candidate ballot-access rules and campaign fundraising by judicial candidates. *Id.* (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986) (third-party ballot access); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (prohibition on fusion candidates); *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1667 (2015) (ban on campaign fundraising solicitations by judicial candidates). None of those cases dealt with burdens on voters' ability to register or cast ballots.

In this context, where the law at issue is one that burdens voters' ability to exercise their right to the franchise, this Court has made clear that a state cannot merely assert vague justifications that are not supported by actual evidence. *See OFA*, 697 F.3d at 434 (restriction likely unconstitutional where state provided "no evidence" to support its "vague" justifications); *NAACP II*, 768 F.3d at 545 ("[T]he state must articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary, meaning it actually addresses, the interest put forth."); *see also Burdick*, 504 U.S. at 434 (balancing must "tak[e] into consideration the extent to which those interests make it necessary to burden the plaintiff's rights"); *Common Cause Ind. v. Individual Members of the Ind. Election Commission*, 800 F.3d 913, 928 (7th Cir. 2015)

(court must consider whether "the interests identified by the State can … be served through other means, making it unnecessary to burden the right to vote"). Thus, the district court appropriately considered the *evidence* regarding the State's asserted interests; and, as set forth below, the findings of fact that the district court made regarding that evidence conclusively demonstrate that "Defendants' justifications for [SB238], while they may be legitimate, are minimal, unsupported, or not accomplished by [SB238]"; that "[SB238] was passed based upon tenuous justifications"; and that "Defendants have failed to establish that the justifications are 'actually necessary' to burden the right to vote of African Americans." Op., R. 117, PageID# 6170-78, 6229.

**<u>Fraud</u>**. With respect to SB238's purported purpose of preventing fraud, the district court found that "while the record includes general opinion evidence that Golden Week increases the opportunity for voter fraud, actual instances of voter fraud during Golden Week are extremely rare[,]" as even Defendant Husted acknowledged. *Id.* at PageID# 6171 (citations omitted); Transcript, R. 97, PageID# 4024; Transcript, R. 100, PageID# 4512, 4649-50, 4656-58, 4679; Transcript, R. 102, PageID# 4956; Transcript, R. 103, PageID# 5086, 5328; Transcripts, R. 104, PageID# 5477; *see also* PX0107, R. 128-38, PageID# 10104-05. Indeed, the SDR aspect of Golden Week did not make fraud any easier to commit because ballots cast by same-day registrants were segregated from other ballots so they could be

pulled if a registrant failed mail-verification. Op., R. 117, PageID# 6173-74; *see* Transcript, R. 97, PageID# 4021-24; Transcript, R. 100, PageID# 4511, 4650, 4658-59; Transcript, R. 102, PageID# 4899-4901; Transcript, R. 103, PageID# 5328; Transcript, R. 104, PageID# 5355-56, 5477-78.

These safeguards worked. For instance, while the State references "two voters who registered and voted on the same day [who] were suspected of voting fraudulently, and the cases were referred to the prosecutor," Appellants' Br. 28, the State omits that in both cases the discrepancy was detected and neither vote counted. Op., R. 117, PageID# 6172; Transcript, R. 100, PageID# 4648-50, 4658, 4680; Transcript, R. 102, PageID# 4899; Transcript, R. 104, PageID# 5381. Similarly, the State cites to the testimony of Matthew Damschroder, the current Assistant Secretary of State and Chief of Staff to Defendant Husted, for the proposition that "[i]n Franklin County, some ballots cast during the overlapping period listed vacant residences." Appellants' Br. 28. However, Damschroder testified that in none of the instances cited by the State did he or investigators determine that the discrepancies provided sufficient reason not to count the ballots. Transcript, R. 104, PageID# 5450.

As this Court found in *NAACP II*, such "evidence" of fraud is insufficient to justify the burdens that the elimination of Golden Week placed on voters, and the State's reliance on *Crawford* is misplaced. "The *Crawford* Court did not hold that

-45-

scattered historical examples of voter fraud necessarily establish a sufficient state interest to overcome any burden imposed on voters; *given the simply minimal burden that the petitioners had shown on voters in that case*, the Court essentially only engaged in a rational basis review of the state's asserted interest in preventing voter fraud, not the more piercing scrutiny that a greater burden would require under *Anderson-Burdick*." *NAACP II*, 768 F.3d at 548 (citing *Crawford*, 553 U.S. at 194-96, 202) (emphasis added). Where, as here, more than *Crawford*'s minimal burden is present, "more searching review of [the State's] asserted justification in preventing voter fraud [i]s warranted." *Id.* at 547.

Moreover, the testimony of a witness for the State showed that a fraudulent Golden Week registrant would be less likely to have his or her vote counted than a fraudulent registrant who registers and votes at different times. After Golden Week was eliminated, voters could still register 29 days before an election and cast an in-person ballot the next day—before the mail-verification process had been completed. Op, R. 117, PageID# 6172-73. Hamilton County Board of Elections Director Sherry Poland testified that unlike a ballot cast during Golden Week, which was segregated until the mail-verification process was complete, the ballot of a fraudulent registrant who registered twenty-nine days before an election and voted the next day would be counted because it is not segregated from other ballots—only Golden Week ballots were. Transcript, R. 104, PageID# 5380-81.

The State's claim that the elimination of Golden Week was necessary to allow election officials enough time to verify a voter's registration fails for essentially the same reason. As this Court has already recognized, "the specific concern [the State] expressed regarding voter fraud—that the vote of an EIP voter would be counted before his or her registration could be verified—was not logically linked to concerns with voting and registering on the same day, but rather has more to do with the registration process and verification of absentee ballots." *NAACP II*, 768 F.3d at 547 (internal quotation marks omitted). "[S]ince Ohio law requires that officials segregate absentee ballots and not count them until registration is verified … there is no reason to think that the registration of voters who registered and voted on the same day during Golden Week would be any harder to verify than an individual who registered on the last permissible day and then voted the next day, or for that matter than someone who voted very close to the election." *Id.* Thus, as in *NAACP II*, the State has failed to meet its "burden of explaining why eliminating Golden Week serves to prevent a 'precise' problem of voter fraud in a way that is 'necessary' to burden the voters Plaintiffs' represent, as opposed to a measure that might more directly target the asserted problem without burdening voters." *Id.*; *see also* Op., R. 117, PageID# 6173-74.

For the foregoing reasons, the district court properly found that "while the interest in preventing voter fraud is a valid one, absent more than very limited

evidence of actual occurrences of voter fraud, it is insufficient to justify the burden imposed by S.B. 238." Op., R.117, PageID# 6174; *see also NAACP II*, 768 F.3d at 547-48.

**<u>Administrative burdens and costs</u>**. The record and the district court's findings of fact also belie the State's contention that the elimination of Golden Week was necessary because of the asserted administrative burdens and costs it imposed. Appellants' Br. 37-38. The administration of Golden Week made up an exceedingly small percentage of counties' budgets for election administration. Op., R.117, PageID# 6174-75. Furthermore, the county boards of elections ("BOEs") remained open during the Golden Week period eliminated by SB238 to process voter registrations and perform other duties. Ohio Rev. Code § 3501.109(B). Thus, "any BOEs that conduct EIP voting at their offices are unlikely to incur substantial additional overhead costs." Op., R. 117, PageID# 6176; *see also NAACP II*, 768 F.3d at 549.

The State similarly failed "to present sufficient evidence that BOEs were unable to manage these administrative burdens when Golden Week was in place or that they will be unable to do so should it be reinstated." Op., R.117, PageID# 6177. Moreover, the court found that the elimination of Golden Week actually hinders election administration by leaving counties with less time to process absentee ballots before the counting of such ballots must begin. Op., R. 117,

PageID# 6177 n.18. In addition, the district court credited the testimony of election officials that Golden Week benefited election administration by relieving pressure on the polls on Election Day. *Id*. Based on this, the district court correctly found that the elimination of Golden Week did not further the State's interest in election administration. *Id*. at 6177 (citing *OFA*, 697 F.3d at 433-34).

**Other asserted state interests**. The other interests proffered by the State plainly do not justify the burdens that SB238 imposes on voters. The State's contention that SB238 is necessary to promote its interest in guaranteeing that early voters will not lack late-breaking information, Appellants' Br. 36, fails because it is based on the report of Sean Trende, which the district court largely disregarded as irrelevant to its analysis, Op., R. 117, PageID# 6142; Opinion and Order, R. 115, PageID# 6095-6103; it is a post-hoc justification for SB238; it is only tangentially related to the elimination of Golden Week given that voters can still cast ballots 28 days before Election Day; and any paternalistic interest the State has in preventing voters from casting ballots when *voters* believe they are ready to do so is plainly not entitled to much weight.

With respect to alleged concerns about voter confusion, the State produced no evidence of any voters who were actually confused about the registration deadline as a result of Golden Week, citing only the speculative testimony of two election officials. Op., R. 117, PageID# 6178. Likewise, the State produced no

evidence that Golden Week undermined the public's confidence in the election system. These interests were therefore entitled to little, if any, weight and plainly do not outweigh the burdens that the elimination of Golden Week imposes on voting rights.

### 2.     The state's arguments for rational basis fail

The State's arguments that the district court should have applied nothing more than rational-basis review fail as well. First, the State argues that this is the case because "voters have no protected right to absentee ballots." Appellants' Br. 22-24. In support of this argument, the State relies principally on *McDonald v. Bd. of Election Commissioners*, 394 U.S. 802 (1969), in which the Supreme Court held that Illinois was not required to send absentee ballots to unsentenced inmates. This argument has been made before, and it failed.

In *OFA*, the plaintiffs challenged Ohio's elimination of the final three days of early voting for nonmilitary voters on *Anderson-Burdick* grounds. 697 F.3d at 430. Citing to *McDonald*, Ohio argued that this reduction in early voting did not trigger heightened scrutiny because absentee voting was, in essence, a gratuity subject only to rational-basis review. *Id*. This Court rejected that argument, explaining that "[t]he *McDonald* plaintiffs failed to make out a claim for heightened scrutiny because they had presented no evidence to support their allegation that they were being prevented from voting." *Id*. at 431; *see also*

*McDonald*, 394 U.S. at 808 ("[W]e cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting."); *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("Essentially the Court's disposition of the claims in *McDonald* rested on failure of proof."). This Court added that "[p]laintiffs did not need to show that they were legally prohibited from voting, but only that burdened voters have few alternate means of access to the ballot," 697 F.3d at 431 (quotation omitted). The plaintiffs in *OFA* had shown this, in similar fashion to Plaintiffs' showing here, by submitting evidence that voters who were "disproportionately 'women, older, and of lower income and education attainment' … represent[ed] a large percentage of those who participated in early voting in past elections." *Id*. Consequently, the court held that "[p]laintiffs have demonstrated that their right to vote [wa]s unjustifiably burdened by the changes in Ohio's early voting regime." *Id*. at 430.

In addition, the State's position that rational-basis review necessarily applies to restrictions on early voting is fundamentally inconsistent with the principle that "[t]here is no 'litmus test' to separate valid from invalid voting regulations" and that "courts must weigh the burden on voters against the state's asserted justifications and 'make the 'hard judgment' that our adversary system demands." *OFA*, 697 F.3d at 429 (quoting *Crawford*, 553 U.S. at 190 (controlling opinion)) (some internal quotation marks omitted). For this reason as well, the State cannot

shield from constitutional scrutiny the burdens imposed by the elimination of Golden Week.

Second, the State appears to suggest that rational basis applies because SB238 does not facially discriminate among Ohio's voters. Appellants' Br. 24-25. This Court has already rejected that argument on multiple occasions. *See Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("*NEOCH I*") (explaining that "the State overlooks the fact that a clear majority of the Supreme Court in *Crawford* applied some form of *Burdick*'s burden-measuring equal protection standard to Indiana's facially neutral voter-identification requirement. (citing 553 U.S. at 189-91 (Stevens, J.), 204 (Scalia, J., joined by Alito and Thomas, JJ.), 211 (Souter, J.)); *see also OFA*, 697 F.3d at 428-29 (stating that the "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways … or places restrictions on the right to vote") (internal citations omitted); *NAACP II*, 768 F.3d at 542-43.[9]

Third, this Court has also rejected the State's argument that, because the district court invalidated SB238 based on the disproportionate burdens it placed on

---

[9] While the State appears to argue for rational basis because SB238 was facially neutral, elsewhere in its brief it acknowledges the well-established principle that "*Anderson-Burdick* balancing applies even to *neutral* laws treating voters equally, illustrating that it resembles substantive due process more than equal protection." Appellants' Br. 19 (emphasis in original) (citing *NEOCH I*, 696 F.3d at 592). Thus, it is unclear why the State later argues that facial neutrality entitles SB238 to rational basis review.

lower income and minority voters as opposed to all voters generally, it was required to find discriminatory intent. Appellants' Br. 32. As explained in *NAACP II*, "[c]ontrary to [the State's] assertion, a majority of the Court in *Crawford* did not expressly hold that a challenger must demonstrate that a voting restriction burdens voters generally in order to trigger scrutiny under *Anderson-Burdick*." 768 F.3d at 543. "The opinion authored by Justice Stevens announcing the judgment of the Court, [which controls], did not … reject the petitioners' argument that the middle level of scrutiny under the *Anderson-Burdick* balancing test could be triggered by evidence of burdens on a subgroup of voters, instead of all voters; rather, the Court held that 'on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.'" *Id*. (quoting *Crawford*, 553 U.S. at 200); *see also Crawford*, 553 U.S. at 202 (controlling opinion) ("In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters.") (citation omitted). The *NAACP II* court also noted that "in *Anderson*, the Supreme Court in fact assessed the burden imposed by the challenged law by looking to its impact on a subgroup of voters." 768 F.3d at 543 (citing *Anderson*, 460 U.S. at 792). Thus, the State's claim that a finding of discriminatory intent was necessary to trigger heightened scrutiny based on

SB238's disproportionate burdens on lower-income and minority voters is without merit.

Fourth, the State claims that the district court was required to compare Ohio's early voting period with those in other states. But, it is well established that "how Ohio's early-voting system compares to that of other states is not relevant under the *Anderson-Burdick* balancing test." *NAACP II*, 768 F.3d at 546. Nor would such a mode of analysis comport with this Court's instruction that "[t]here is no 'litmus test' to separate valid from invalid voting regulations" and that "courts must weigh the burden on voters against the state's asserted justifications and 'make the 'hard judgment' that our adversary system demands.'" *OFA*, 697 F.3d at 429 (quoting *Crawford*, 553 U.S. at 190 (controlling opinion)) (some internal quotation marks omitted). [10] Moreover, as explained above, such a simplistic comparison would confuse, rather than illuminate, the relevant issues, as it necessarily would ignore the significance of the 2004 election to the enactment of Ohio's early voting regime, Ohio's ongoing problem with long lines, and other

---

[10] The requirement that courts weigh a voting restriction's burdens on voting against the state interests it serves and then make the hard judgment that our adversary system demands, *OFA*, 697 F.3d at 429, also refutes the State's argument (with no support from the relevant case law) that the district court's application of the *Anderson-Burdick* test transforms the Fourteenth Amendment into a "one-way ratchet" that discourages states from innovating. Appellants' Br. 38-39. The *Anderson-Burdick* test does not categorically bar states from burdening voting rights; it simply prevents them from doing so where, as here, they lack sufficient justification.

relevant factors such as Ohio's limitation on early voting to one location per county.

Finally, the State clutches onto the district court's description of the burdens at issue as "modest" to contend that nothing more than rational-basis review is necessary. Appellants' Br. 33-34. To begin with, the case law makes clear that "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin*, 65 F.3d at 1229 n.6; *see also Burdick*, 504 U.S. at 439-40 (determining, first, that challenged election provision imposed "slight" burden and then applying balancing test to conclude that the "legitimate interests asserted by the State are sufficient to outweigh the limited burden"); *Crawford*, 553 U.S. at 191 (controlling opinion) ("[h]owever slight [a] burden [on voting] may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation") (citation and quotation marks omitted). But more fundamentally, the State's position is a purely semantic argument that ignores the district court's explicit statement that it was using the term "modest" to mean "a more than minimal but less than significant burden," Op., R. 117, PageID# 6156-57, as well as the extensive factual findings detailing the obstacles Ohio voters generally, and lower-income and minority voters in particular, face as a result of the elimination of Golden Week. As such, the

controlling case law makes clear that the State was required to set forth "the 'precise interests … for the burden imposed by its rule'" and to demonstrate why "'those interests make it necessary to burden the plaintiff's rights.'" *Common Cause Ind.*, 800 F.3d at 921 (quoting *Burdick*, 504 U.S. at 434, and *Anderson*, 460 U.S. at 789). Because the State failed to do so, the district court properly found that the elimination of Golden Week unduly burdens the fundamental right to vote.

## CONCLUSION

For the forgoing reasons, this Court should affirm the district court's decision.

Respectfully submitted,

DATED: July 11, 2016                    **PERKINS COIE LLP**

By: /s/ *Marc E. Elias*
      Marc E. Elias
      Bruce V. Spiva
      Elisabeth C. Frost
      Rhett P. Martin
      Amanda R. Callais
      700 Thirteenth Street, N.W., Suite 600
      Washington, D.C. 20005-3960
      Telephone: 202.654.6200
      Facsimile: 202.654.6211

      Joshua L. Kaul
      1 East Main Street, Suite 201
      Madison, WI 53705
      Telephone: 608.294.4007
      Facsimile: 608.663.7499

      Donald J. McTigue
      J. Corey Colombo
      Derek S. Clinger
      McTigue & Colombo LLC
      545 East Town Street
      Columbus, OH 43215
      Telephone: 614.263.7000
      Facsimile: 614.263.7078

      *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(7)(B):

1.     Exclusive of the portions of the brief exempted by 6th Cir. R. 32(b)(1), the brief contains 13,956 words.

2.     The brief has been prepared in proportionally spaced typeface using a Times New Roman, 14 point font.

*/s/ Marc E. Elias*
MARC E. ELIAS

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2016, a copy of this brief was served through the Court's electronic filing system. Electronic service was therefore made upon all counsel of record on the same day.

*/s/ Marc E. Elias*
MARC E. ELIAS

### DESIGNATION OF DISTRICT COURT RECORD

Plaintiffs-Appellees, Ohio Democratic Party, Democratic Party of Cuyahoga

County, Montgomery County Democratic Party, Jordan Isern, Carol Biehle, and

Bruce Butcher designate the following district court documents:

| ECF No. | Date Filed | Name of Document | PageID# Range |
|---|---|---|---|
| 1 | 5/8/2015 | Complaint | 1–62 |
| 41 | 9/8/2015 | Amended Complaint | 449–513 |
| 79 | 11/13/2015 | Plaintiffs' Trial Brief | 2634–2706 |
| 96 | 12/7/2015 | Trial Transcript Vol. I (11/16/2015) | 3540–3799 |
| 97 | 12/7/2015 | Trial Transcript Vol. II (11/17/2015) | 3800–4075 |
| 98 | 12/7/2015 | Trial Transcript Vol. III (11/19/2015) | 4076–4304 |
| 99 | 12/7/2015 | Trial Transcript Vol. VI (11/20/2015) | 4305–4488 |
| 100 | 12/7/2015 | Trial Transcript Vol. V (11/23/2015) | 4489–4693 |
| 101 | 12/7/2015 | Trial Transcript Vol. VI (11/24/2016) | 4694–4846 |
| 102 | 12/7/2015 | Trial Transcript Vol. VII (11/30/2015) | 4847–5076 |
| 103 | 12/7/2015 | Trial Transcript Vol. VIII (12/1/2015) | 5077–5343 |
| 104 | 12/7/2015 | Trial Transcript Vol. IX (12/2/2015) | 5344–5530 |
| 105 | 12/7/2015 | Trial Transcript Vol. X (12/3/2015) | 5531–5626 |
| 111 | 12/22/2015 | Plaintiffs' Proposed Findings of Fact and Conclusions of Law | 5928–6000 |
| 115 | 5/24/2016 | Opinion and Order Denying in Part and Granting in Part Plaintiffs' Motions in Limine | 6078–6103 |
| 116 | 5/24/2016 | Opinion and Order Regarding Evidentiary Objections | 6104–6122 |
| 117 | 5/24/2016 | Findings of Fact and Conclusions of Law | 6123–6242 |
| 118 | 5/24/2016 | Clerk's Judgment | 6243 |
| 125 | 6/9/2016 | Order Granting in Part and Denying in Part Motion to Stay Pending Appeal | 6300–6308 |
| 127-14 | 6/22/2016 | DX0014: Expert Report of Sean Trende (9/18/2015) | 6601–6709 |

| ECF No. | Date Filed | Name of Document | PageID# Range |
|---------|-----------|------------------|---------------|
| 127-14 | 6/22/2016 | DX0014-K: *Ohio St. Conf. of the NAACP v. Husted*, Settlement Agreement Among Plaintiffs and Defendant Sec. of St. Jon Husted (4/17/2015) | 6772–6790 |
| 127-15 | 6/22/2016 | DX0015: Expert Report of Dr. M.V. Hood, III (9/18/2015) | 7225–7311 |
| 127-18 | 6/22/2016 | DX0018: Rebuttal Expert Report of M.V. Hood III | 7364–7392 |
| 128-11 | 7/7/2016 | PX0022: Amended Substitute Senate Bill Number 200 | 9796–9806 |
| 128-12 | 7/7/2016 | PX0023: Substitute Senate Bill Number 205 | 9807–9828 |
| 128-13 | 7/7/2016 | PX0024: Substitute Senate Bill Number 216 | 9829–9861 |
| 128-14 | 7/7/2016 | PX0025: Amended Senate Bill Number 238 | 9862–9866 |
| 128-22 | 7/7/2016 | PX0033: Ohio Senate Journal (SB 216 and SB 238) (11/20/2013) | 9901–9916 |
| 128-23 | 7/7/2016 | PX0034: Ohio House of Representatives Journal (SB 216) (2/23/2014) | 9917–9951 |
| 128-24 | 7/7/2016 | PX0035: Ohio Senate Journal (SB 200) (10/30/2013) | 9952–9977 |
| 128-25 | 7/7/2016 | PX0036: Ohio Senate Journal (SB 205 and SB 238) (2/19/2014) | 9978–10004 |
| 128-26 | 7/7/2016 | PX0037: Ohio House of Representatives Journal (SB 205) (2/19/2014) | 10005–10034 |
| 128-27 | 7/7/2016 | PX0038: Ohio House of Representatives Journal (SB 200) (12/11/2013) | 10035–10062 |
| 128-36 | 7/7/2016 | PX0107: Expert Report of Dr. Lorraine Minnite (9/18/2015) | 10095–10129 |
| 128-40 | 7/7/2016 | PX0109: Expert Report of Dr. Jeffrey Timberlake (9/18/2015) | 10141–10219 |
| 128-41 | 7/7/2016 | PX0110: Rebuttal Expert Report of Dr. Jeffrey Timberlake (10/16/2015) | 10220–10237 |
| 128-44 | 7/7/2016 | PX0113: Expert Report of Dr. Muer Yang (9/18/2016) | 10246–10268 |

| ECF No. | Date Filed | Name of Document | PageID# Range |
|---|---|---|---|
| 128-46 | 7/7/2016 | PX0119: Ohio House of Representatives Journal (SB 238) (2/24/2014) | 10278–10285 |